## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PETER R. VANDERHOOF, Individually and on Behalf of a Class of Persons Similarly Situated, | : : : | **Case No. 05CV3637 (LLS)** "ECF Case" |
| Plaintiff, | : : | |
| v. | : : | |
| S.A. JOHNSON, KATHLEEN LIGOCKI, ANTHONY FERNANDES, JURGEN GEISSINGER, ALI JENAB, JOE LOUGHREY, JAMES R. LOZELLE, GEORGIA R. NELSON, ENRIQUE ZAMBRANO, CHRISTOPHER T. HATTO, DUGALD K. CAMPBELL and SCOTT D. RUED, | : : : : : : : : | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITIES ACT** |
| Defendants. | : : | |

Plaintiff, on his own behalf, on behalf of all other persons similarly situated (the "Participants"), and on behalf of the Tower Automotive Retirement Plan, Tower Automotive Union 401(K) Plan, Tower Automotive Products Savings Investment Plan, and Tower Automotive Products Employee 401(K) Savings Plan (collectively referred to as the "Plans"), by his attorneys, alleges the following:

### NATURE OF ACTION

1.     This is a civil enforcement action brought pursuant to §502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132.

2.     The lawsuit concerns the Plans.  The Plans are employee benefit plans established by Tower Automotive, Inc.  ("Tower Automotive" or the "Company") to provide the Company's

employees tax-advantaged savings for retirement and other long-term goals. The Plans are defined contribution plans covering a significant amount of Tower Automotive's employees.

3.      This action is brought on behalf of Plaintiff Peter R. Vanderhoof against defendants S.A. Johnson, Kathleen Ligocki, Anthony Fernandes, Jurgen Geissinger, Ali Jenab, Joe Loughrey, James R. Lozelle, Georgia R. Nelson, Enrique Zambrano, Christopher T. Hatto, Dugald K. Campbell, Jurgen M. Geissinger, and Scott D. Rued.  Defendants are the administrators and directors of the Plans and/or the directors and/or officers of the Company.

4.      Plaintiff Peter R. Vanderhoof is a current or former employee of Tower Automotive and participant in the Tower Automotive Retirement Plan.  Plaintiff alleges that defendants, Tower Automotive and certain individuals, are fiduciaries of the Plans, and breached their fiduciary duties to him and the other participants and beneficiaries of the Plans, in violation of ERISA §409, 29 U.S.C. §1109, in connection with the Plans' holdings of Tower Automotive common stock.  Plaintiff alleges that defendants are obliged under ERISA to make the Plans whole for the losses suffered as a result of defendants' failure to discharge their fiduciary obligations.

5.      Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes a participant to sue for plan-wide relief for breaches of fiduciary duty, Plaintiff brings this action on behalf of himself and all the participants and beneficiaries of the Plans during the relevant period.

6.      Tower Automotive is a global designer and producer of vehicle structural components and assemblies used by major automotive original equipment manufacturers, including BMW, DaimlerChrysler, Fiat, Ford, GM, Honda, Hyundai/Kia, Nissan, Toyota, Volkswagen and Volvo. The Company was developed out of a roll-up of many small companies.

2

During the 1990s, Tower Automotive experienced rapid growth by pursuing a development strategy known as roll-up, whereby the Company aggressively acquired smaller parts manufacturers.  This strategy, however, burdened Tower Automotive with significant debt, as the Company acquired too many companies, overpaid for companies, and failed to adequately integrate its acquisitions.  By August 2001, Tower Automotive was deep in debt and struggling to maintain liquidity, having one of the most-leveraged balance sheets in the industry.

7.      By no later than the beginning of the Class Period, Defendants knew or should have known that because of Tower's financial condition and its failing operational performance that the Company's stock was a highly inappropriate investment for a long-term retirement savings plan such as the Plan.  Defendants, however, despite their knowledge of Tower's financial and operational problems, continued to offer Tower Automotive stock as a Plan investment option, and failed to impute or disclose their full knowledge of the Company's struggling operations to Plan Participants. As a result of this non-disclosure, Plan Participants could not make informed decisions concerning their Plan investments in Company stock.

8.      Additionally, Defendants knew or should have known that Tower Automotive's poor financial condition made the Company extremely vulnerable to a variety of intrinsic and extrinsic economic factors, events and industry trends.  During the Class Period, several events brought increasing financial pressure on the Company's liquidity, further eroding Tower Automotive's already poor financial condition.  Among these factors were (i) extended pricing pressure from Tower Automotive's customers, (ii) a dramatic increase in steel prices, and (iii) a lackluster economy that eroded demand for Tower Automotive products.  Although Defendants knew or should have known by the beginning of the Class Period that Tower Automotive was an

inappropriate investment, Defendants also knew that a convergence of macroeconomic events which arose during the Class Period had caused a significant deterioration of Tower Automotive's ability to operate as an ongoing business.  Defendants breached their fiduciary duties to the Plan, as a result of Defendants permitting the Plan to continue to acquire and retain shares of Tower Automotive common stock.

9.      On February 2, 2005, Tower Automotive filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in the Southern District of New York, thus wiping out the value of the Plans' holdings of Tower Automotive common stock.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).

11.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e)(l), 29 U.S.C.  §1132(e)(l), and personal jurisdiction over defendants pursuant to Fed. R. Civ. P. 4(k).

12.      Venue is proper in this district pursuant to ERISA §502(e)(2), 29 U.S.C. § 1132(e)(2), because Tower Automotive conducts business, or may be found, in this District.  Moreover, related securities and other ERISA class actions are pending in this District.  In addition, Tower has sought protection under the bankruptcy laws of the United States in this District.

4

## PARTIES

### Plaintiff

13.     Plaintiff Peter R. Vanderhoof is a participant of the Plan within the meaning of ERISA §3(7), 29 U.S.C. § 1002(7).  Through numerous employee contributions and employer contributions, Plaintiff acquired securities of Tower Automotive during the Class Period.

### Defendants

14.      Tower Automotive Inc. is a Delaware corporation with its principal place of business situated at 27175 Haggerty Road, Novi, Michigan 48377.  The Company designs and produces structural components and assemblies used in the automotive industries.  Tower Automotive is not named  as a defendant herein because it filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code on February 2, 2005, in the Southern District of New York.

15.     Defendant S. A. (Tony) Johnson ("Johnson") served as Chairman and a Director of Tower Automotive since April 1993.  Johnson was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Johnson also through his participation in communications to Plan Participants; for example, by his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

16.     Defendant Kathleen Ligocki ("Ligocki") served as President and Chief Executive Officer of Tower Automotive since August 2003 and as a Director since September 2003. Ligocki was a fiduciary of the Plans within the meaning of ERISA in that she exercised

discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Ligocki also acted as a fiduciary through her participation in communications to Plan Participants, including her execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

17.     Defendant Anthony Fernandes ("Fernandes") served as a Director of Tower Automotive since May 2003.  Fernandes was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Fernandes also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

18.     Defendant Juergen M. Geissinger ("Geissinger") served as a Director of Tower Automotive since May 2000.  Geissinger was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Geissinger also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

19.     Defendant Ali Jenab ("Jenab") served as a Director since January 2001.  Jenab was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii)

6

management and disposition of the Plans' assets.  Jenab also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

20.     Defendant Joe Loughrey ("Loughrey") served as a Director of Tower Automotive since November 1994.  Loughrey was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Loughrey also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

21.     Defendant James R. Lozelle ("Lozelle") served as a Director of Tower Automotive since May 1994.  Lozelle was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Lozelle also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

22.     Defendant Georgia R. Nelson served as a Director since May 2001.  Nelson was a fiduciary of the Plans within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Nelson also acted as a fiduciary through her participation in

communications to Plan Participants, including her execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

23.     Defendant Enrique Zambrano ("Zambrano") served as a Director of Tower Automotive since December 1997.  Zambrano was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Zambrano also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

24.     Defendant Christopher T. Hatto ("Hatto") was at all relevant times the Company's Chief Accounting Officer ("CAO").  Hatto was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets. Hatto also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Plans' Form 11-Ks.

25.     Defendant Dugald K. Campbell ("Campbell") served as the President, Chief Executive Officer and Director from December 1993 until his retirement in August 2003. Campbell was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Campbell also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the

Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

26.     Defendant Scott D. Rued ("Rued") served as a Director of Tower Automotive at all relevant times until his retirement from that position in May 2003.  Rued was a fiduciary of the Plans within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plans; and/or (ii) management and disposition of the Plans' assets.  Rued also acted as a fiduciary through his participation in communications to Plan Participants, including his execution of the Company's Registration Statement on Form S-8 relating to shares of Tower Automotive stock to be issued to Plan Participants.

27.     The defendants referred to in paragraphs 15-26, above, are collectively referred to herein as the "Individual Defendants."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class of all persons similarly situated (the "Class"). The Class consists of all persons who were participants in, or beneficiaries of, the Plans at any time from August 3, 2001 through the present (the "Class Period"). Excluded from the Class are defendants, directors of the Company at times relevant hereto, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were thousands of current and former employees of Tower Automotive who were participants in or beneficiaries of the Plans.  While the exact

number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class.

30.     Plan participants and beneficiaries may be identified from records maintained by Tower Automotive or the Plans' trustee and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.

31      Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' breaches of their fiduciary duties and wrongful conduct in violation of federal law that is complained of herein.

32.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in ERISA class actions as well as other class action and securities litigation.

33.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among, but not limited to, the following are questions of law and fact common to the Class, including:

        (a)     Whether defendants breached their fiduciary duties owed to Plan participants and beneficiaries;

        (b)     Whether defendants' communications to participants provided complete and accurate disclosure of information concerning the risks of investing in Tower Automotive stock;

        (c)     Whether defendants provided false and/or misleading information, or failed to disclose material information, concerning the financial condition of the Company;

10

(d)     Whether defendants took steps, if any, to investigate and monitor whether it was appropriate to continue to offer Company stock as an investment option for Plan participants;

(e)     Whether defendants take adequate steps to protect the Plans and recover the Plans' damages.

34.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the of the members not parties to the actions, or substantially impair or impede their ability to protect their interests.

35.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for defendants; (ii) defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory and other appropriate equitable relief with respect to the Class as a whole; and (iii) questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.  There will be no difficulty in the management of this action as a class action.

36.     There are one or more putative securities class actions pending against Tower Automotive and other defendants. The claims herein arise under ERISA and related principles, and are not being asserted by the plaintiffs in the securities class actions. The named plaintiffs in

those class actions do not adequately represent Plaintiff or the Class herein with respect to ERISA claims, and may be subject to defenses and limitations of liability under the Private Securities Litigation Ret Act, 15 U.S.C. §78u-4 a seq., and other statutes or Rules that do not apply to the claims asserted herein

37.     As required by ERISA, Defendants carry insurance for claims asserted herein that may not be available to the defendants in the securities class actions.

38.     There are people in this Class who are not members of the classes or putative classes in the securities class action cases.

## THE PLANS

39.     Upon information and belief, the Plans are each an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A).  Further, the Plans are "eligible individual account plan[s]" within the meaning of ERISA §407(d)(3), 29 U.S.C. § 1107(d)(3), and also are "qualified cash or deferred arrangement" within the meaning of I.R.C. §401 (k), 26 U.S.C. §401(k). The Plans are not parties to this action.  Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plans.

40.     Tower Automotive was formed to acquire R.J. Tower, now a wholly-owned subsidiary of the Company.  R.J. Tower is the sponsor and administrator of the Plans.

41.     .Subject to Internal Revenue Service limitations, participants of the Plans were permitted to contribute before and after tax payroll deductions to the Plans.  According to the 2003 Form 11-K filed with the SEC on June 28, 2004, participants could elect to make contributions to the Plans through payroll deductions of 1 percent to 90 percent of their compensation.

42.     Participants directed the investment of their contributions to various investment options available in the Plans.  Most of these options were diversified mutual funds. However, the options also included the Tower Automotive Company Stock Fund which invested solely in the common stock of Tower Automotive.

43.     The Company made discretionary matching contributions to each participant based on the participant's contribution. This matching contribution amount was determined annually. According to the Form 11-K filed with the SEC, in 2003 the Company elected to make matching contributions of 100 percent of the first 3 percent of each employee's eligible wages deferred, plus 50 percent of the next 2 percent of each employee's eligible wages deferred.

44.     The Plans also provided that the Company could make annual discretionary profit-sharing contributions as determined by the Board of Directors on an annual basis.

45.     Participants' contributions to the Plans and employer-matching contributions were always fully vested. Participants became fully vested in the Company's discretionary profit-sharing contributions after the completion of three years of service.

## DEFENDANTS' FIDUCIARY STATUS

46.     During the Class Period, upon information and belief, defendants exercised discretionary authority and discretionary control with respect to the management of the Plans and/or the management or disposition of the Plans' assets and had discretionary authority or discretionary responsibility for the administration of the Plans.

47.     During the Class Period, all of the defendants acted as fiduciaries of the Plans pursuant to ERISA §3(21)(A), 29 U.S.C. §1002(21)(A) and the law interpreting that section.

48.     ERISA requires every plan to provide for one or more named fiduciaries, who will

13

have "authority to control and manage the operation and administration of the plan." ERISA §402(a)(l), 29 U.S.C. §1102(a)(l).

49.     Upon information and belief, instead of delegating all fiduciary responsibility for the Plans to external service providers, Tower Automotive chose to comply with the requirement of section §402(a)(l) by internalizing this fiduciary function.

50.     During the Class Period, the Company designated a Plan Committee. Upon information and belief, this Committee comprised, at least in part, a specially selected group of Company employees appointed by the Board of Directors of Tower Automotive to act as the administrators of the Plans and responsible for, *inter alia*, establishing investment objectives and policies for the entire Plan – including investment in Company Stock.  According to the Form 11-Ks filed with the SEC on June 28, 2004, the Plan Committee interprets and communicates the provisions of the Plans, ensures that all government and participant reporting requirements are fulfilled, and approves certain distributions from the Plans to participants.  The Plan Committee members, each named fiduciaries of the Plans, were each appointed by the Board of Directors and operated with oversight of the Board of Directors. The actions of employee-fiduciaries were on behalf of and are attributable to the Company.

51.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under Section §402(a)(l), but also any other persons who act in fact as fiduciaries, *i.e.*, perform fiduciary functions. ERISA §3(21)(A)(i), 29 U.S.C. §1002(2l)(A)(i)) makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management of disposition of its

assets. …" During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA.

52.     Moreover, Tower Automotive and the Individual Defendants performed fiduciary functions by communicating with Plan Participants with respect to the Plans including, without limitation, through Tower Automotive's Form S-8 Registration Statements, the Plan Prospectus, and Tower Automotives's periodic reports filed with the SEC and incorporated by reference into the Form S-8 Registration Statements and the Plan Prospectus.

53.     In addition under ERISA, in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable. To the extent any of the defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the fiduciary breaches described below.

## SUBSTANTIVE ALLEGATIONS

54.     Tower Automotive is a global designer and producer of vehicle structural components and assemblies used by major automotive original equipment manufacturers, including BMW, DaimlerChrysler, Fiat, Ford, GM, Honda, Hyundai/Kia, Nissan, Toyota, Volkswagen and Volvo. The Company's products include body structures and assemblies, lower vehicle frames and structures, chassis modules and systems, and suspension components. Tower Automotive has more than 60 manufacturing, product development and administrative facilities throughout the world.

55.     Tower Automotive experienced rapid growth by pursuing a development strategy known as roll-up, whereby the Company aggressively acquired smaller parts manufacturers.  This strategy, however, burdened Tower Automotive with significant debt, as the Company acquired too many companies, overpaid for companies, and failed to adequately integrate its acquisitions.  By

August 2001, Tower Automotive was deep in debt and struggling to maintain liquidity, having one of the most-leveraged balance sheets in the industry.

56.     On August 3, 2001, the first day of the Class Period, *Moody's Investors Service* ("*Moody's*"), a leading provider of credit ratings, research, and analysis for debt instruments and other securities, downgraded the credit ratings of Tower Automotive and its subsidiaries.  The *Moody's* report provides a plethora of concerns that had affected the Company prior to the beginning of the Class Period, continued to affect the Company in 2002, and would ultimately lead to the Company's demise.  These problems were known, or should have been known, by defendants and should have alerted defendants, as fiduciaries, to the high-risk nature of Tower Automotive stock as a Plan investment option.  Yet, these concerns were largely ignored, despite the fact that the convergence of negative events which had occurred, were ongoing, and would continue throughout the Class Period until the Company ultimately filed for bankruptcy protection.

57.     The *Moody's* report set forth the following rationale for the downgrade:

Moody's downgrade of Tower's ratings and our negative outlook were triggered by the company's significantly weakened last-twelve-month operating performance; marked deterioration of credit protection measures; and currently limited ability to utilize more than about $300 million of its $825 million bank revolving credit facility due to financial covenant constraints. These developments are attributable to the convergence of a series of unfavorable market and product mix factors, along with approximately $35 million of cash restructuring costs and an unusually large investment need associated with Tower's record number of major new program launches. Tower's sales volume has been hurt, similarly to the sales volumes of its peers, by the cyclical downturn in North American OEM automotive production volumes. The negative margin impact has been further exacerbated by the company's high fixed overhead level. Tower's customer base is additionally characterized by high concentrations with domestic OEM's Ford and DaimlerChrysler, which together accounted for over 65% of Tower's fiscal 2000 revenues (excluding joint ventures). Since the third quarter of 2000, both Ford and DaimlerChrysler have experienced greater-than-average production cuts as a consequence of dealer inventory management; the Firestone tire recalls which acutely affected Ford Explorer and Ranger production; and the continued loss of North American market share. Tower

has additionally experienced a recent shift in its product mix to include increased business with lower-than-historical margins as a consequence of several factors. These include the end of the life cycle of certain older platforms; the addition of less profitable revenue bases of certain strategic foreign acquisitions during 2000 and early 2001; Tower's currently limited control over module sourcing; and the dramatic downturn of the heavy duty market and the subsequent sale by Tower of its heavy-duty business to the company's Metalsa Mexican joint venture (which enjoys a much lower average wage rate). Tower is furthermore in the process of gearing up for four major near-term program launches, which undertaking entails very material up-front cash investments in the form of capital expenditures; launch expenses; tooling; and design that must be spent well in advance of the revenue stream that will ultimately be generated. Moody's continues to be concerned with Tower's strong reliance on the successful execution and public reception of these key new programs, all of which potentially face stiff competition from an increased level of product offerings by foreign OEM's and OEM transplants. Tower may be particularly exposed with regard to the success of the new Ford Explorer, given the platform's delayed launch earlier this year and the possibly irreversible long-term damage to the Ford Explorer's reputation which may have resulted from recent negative publicity regarding the vehicle. While Tower has more recently been focusing on expanding its ability to service OEM's globally and to achieve geographic diversification through acquisitions and joint venture investments, 85% of the company's 2000 revenues were still generated in the US and Canada.

* * *

Future events that would have potential negative implications for Tower's ratings include material unforeseen difficulties encountered with Tower's 2001 launches; the possible failure of the key new platforms on which Tower has material content to achieve anticipated sales volumes; the inability of Tower to further diversify its customer base (unlikely in light of a growing relationship with Nissan, as well as with certain other foreign OEM's); or a prolonged automotive industry downturn during which Tower cannot adequately manage its operating leverage or working assets. Future events that would have potential positive rating implications include evidence of success with program launches in progress; diversification across a larger number of platforms; and greater financial flexibility, including improved revolving credit access or capital markets transactions.

* * *

For the 12 months ended June 30, 2001, Tower achieved revenues of approximately $2.44 billion, down almost 4% year-over year. Significant declines for Ford, DaimlerChrysler and heavy duty revenues were partially offset by lower-margin revenues from foreign acquisitions. Tower's LTM Adjusted EBITDA Margin (before restructuring expenses) declined year-over-year from about 16%, to about 12%, due to factors identified above. Tower's leverage, as measured by "Total Debt Incl.

Preferred Stock/Adjusted EBITDA", rose markedly from under 2.5x a year ago to about 4.1x including only on-balance sheet debt, and to about 4.7x after additionally including about $60 million of off balance sheet debt and the $104 million net present value of a new operating lease for assembly equipment. Tower's LTM June 30, 2001 adjusted EBITA interest and dividend coverage fell from over 5.5x, to only about 2.0x. Tower's LTM June 30, 2001 adjusted EBITA return on assets fell by almost 50% over the course of the past year to approximately 6%, but would be expected to improve rapidly as the 2001 new program launches each take effect.

58.    On August 7, 2001, during a presentation to analysts at the J.P. Morgan/Harbour auto conference, Tower Automotive's then-chief financial officer, Anthony Barone, told analysts that third-quarter 2001 would be the Company's most difficult to date.

59.    On August 16, 2001, Ford Motor Company ("Ford"), citing a sluggish economy, announced that it would cut production by 8% in its next quarter.  Citing Tower Automotive's dependence on business from Ford, accounting for approximately 35 percent of Tower Automotive's revenues, securities analyst Wendy Needham of Credit Suisse First Boston downgraded her rating of Tower Automotive's common stock.

60.    On September 20, 2001, Tower Automotive announced that it was canceling one of four shifts on its Ford Ranger frame-manufacturing line, resulting in the termination of 50 employment positions at its plant in Milwaukee, Wisconsin, as a result of Ford's reduction in the production schedule for its Ford Ranger.

61.    On September 28, 2001, the Company lowered its sales and earnings guidance for the third and fourth quarters of 2001, citing the likelihood of slow sales of automobiles and resulting production cuts by automakers, including Ford.  The Company also announced that it would be able to meet debt obligations through year end, an announcement which indicated concerns about the struggling Company's financial position and liquidity

62.     On October 18, 2001, Tower Automotive reported a loss of $1.4 million for the third quarter of 2001, compared with its  prior-year operating profit of $10 million. The Company also announced plans to close a stamping and assembly plant in Sebewaing, Michigan, thus eliminating 500 jobs.  Kenneth Blaschke, a securities analyst for Deutsche Banc Alex. Brown, noted that if Tower Automotive's  Asian sales had been included in the consolidated results instead of counted as equity income, the Company's sales would have declined 13 percent.  Defendant Campbell stated that earnings were of secondary importance to the liquidity and management of the Company's cash flow.  In a Company press release, defendant Campbell commented on the quarter's financial results as follows:

> This year has continued to prove to be the most difficult year in Tower Automotive's history. Our third quarter results were impacted by unplanned volume declines in our U.S. and Canada region and continued new product launch costs during the quarter. Third quarter performance has further contributed to weak performance year-to-date when compared to the 2000 period.

63.     On December 28, 2001, the Company announced a reorganization and restructuring plan.  In connection with the plan, the Company announced that it would incur charges of $289 million in the fourth quarter of 2001.  The charges, along with the restructuring plan, reflected the growing challenges faced by the auto parts industry as automobile sales stagnated and manufacturers faced an extremely competitive market where the predominant strategy became competition through pricing incentives.  As a result, auto manufacturers began pressuring suppliers such as Tower Automotive to lower prices and limit production.  These macroeconomic issues exposed Tower Automotive's extreme vulnerability early in the Class Period.  As reported in an article titled "High Yield Auto Parts Suppliers Facing Tough First Half, published on January 8, 2002 by Dow Jones & Company, Inc. ("Dow Jones"), the auto parts industry as a whole was facing

a challenging short-term outlook as a consequence of expectations of poor auto sales which in turn caused automobile manufacturers to direct parts manufacturers to maintain low production levels. The Dow Jones article noted that the bond prices of automobile manufacturing related companies were at or near "distressed" levels. Other reports from market analysts echoed the gloomy outlook for the sector and added to the concern for highly leveraged companies and those bearing high interest expenses.

64.     On January 25, 2002, Tower Automotive announced fourth-quarter and full-year results for the period ended December 31, 2001. The Company reported adjusted fourth-quarter net income of $3 million on revenues of $639 million, down from adjusted net income of $15 million on revenues of $629 million for the same period a year earlier. However, including impairment and restructuring charges, the Company reported a net loss of $296 million for the fourth quarter, compared to a net loss of $70 million for the same period a year earlier including impairment charges. For the year, the Company reported a net loss of $268 million including the effect of restructuring and impairment charges, compared to a net income of $13 million for 2000. The charges for the quarter totaled $384 million – $203 million to write-down goodwill and an underperforming asset and $181 million for a plant closure in Michigan.

65.     Indicating the continuing threat and concern over its debt, liquidity and expenses during the Class Period, the Company commented that it "achieved significant reduction in debt through. . . financing activities." During 2001, the Company reduced its debt to $601 million, down $320 million, or approximately 30%. Commenting on initiatives instituted during 2001 to address the difficult sector environment, defendant Campbell stated, "[w]e also made difficult decisions to reduce our manufacturing capacity and administrative footprint, to more closely align

the cost structure of Tower Automotive to the current economic outlook for automotive production." The Company stated that it expected continued weakness in production volumes for the first part of 2002.

66.     On January 31, 2002, the Company announced that it was discontinuing certain operations of its Milwaukee Press Operations facility, resulting in the termination of approximately 400 employees. In connection with this action, the Company announced that it would record cash closing charges of $15 million and non-cash charges of $60 million related to asset impairment.

67.     On February 1, 2002, J.P. Morgan raised its investment rating for Tower Automotive common stock. In April 2002, J.P. Morgan was selected to serve as an underwriter for an offering of Tower Automotive common stock that would result in net proceeds of $222.5 million to the Company in June 2002. Despite the increasing the rating and target price for the Company's stock in its February 2002 report, J.P. Morgan analyst David Bradley stated in the report that "[w]e believe the risks facing Tower – both economic and company specific – remain considerable."

68.     On March 16, 2002, corporate credit ratings agency Standard & Poor's ("S&P") lowered the credit rating of Tower Automotive to "BB." In its report, S&P stated that the reduction reflected "deterioration in Tower's financial flexibility following a challenging year" marked by automotive production declines and delayed product launches. As reflected by the Company's actions to address its extensive leverage and debt, defendants knew that deterioration in the Company's credit rating would result in greater financial pressure on the Company and could prove potentially fatal to the Company's existence.

69.     Acknowledging that its leverage and debt continued to be a risk, the Company announced on April 3, 2002, that it was issuing 15 million shares to the public, along with an over-

allotment option of 2.25 million shares, in order to raise capital.  According to the Form S-3 filed

with the Securities and Exchange Commission ("SEC") on April 3, 2002, the Company "will use

the net proceeds from the offering to repay borrowings under our senior credit facility."  The

offering would commence in June 2002, resulting in net proceeds to the Company of $222.5

million.

70.     Despite its purported efforts to strengthen its liquidity by reducing debt, the

Company was also utilizing other means to allow it to sustain its business amid a difficult economic

climate.  A *Wall Street Journal* article published May 8, 2002, entitled "Cash Flow? It Isn't Always

What It Seems," discussed accounting techniques that can be used to create the appearance that a

company's cash flow is stronger than its operations reflect.  The article also discussed

interpretations of a Company's accounts payable figure, and commented on Tower Automotives

accounting as follows:

> Companies also can adjust operating cash flow upward by taking longer to
> pay their vendors, thereby increasing their accounts payable, Mr. Mulford notes. . . .

* * *

> An increase in accounts payable also helped Tower Automotive Inc. in a
> difficult 2001; the company lost $268 million from continuing operations last year,
> after making $16 million the previous year.  But operating cash flow looked far
> better in 2001, up to $514 million from $93 million in 2000, helped by a rise in
> accounts payable to $369 million from $248 million the year before.

> Like American [Airlines], "Tower was taking longer to pay in a difficult
> year," says Mr. Mulford. . . . But in its most recent annual report, the company said
> it was seeking longer terms from vendors to improve its management of working
> capital.

71.     On June 24, 2002, *Moody's* raised Tower Automotive's credit rating outlook to stable from negative, citing, among other things, the recent capital injection from the stock offering. The *Moody's* report stated, in pertinent part, as follows:

> Tower's ratings remain constrained by the fact that the company continues to face several critical risk factors which are expected to hamper performance going forward. Tower was very challenged during 2001 on both operational and financial fronts by its three major program launches. Tower risks future launch difficulties in the event that the company does not identify how to avoid similar problems in the future, or if it once again commits to a large number of programs that must be launched simultaneously. The company's ongoing liquidity would benefit significantly in the event that up-front capital investment in new programs can be reduced either through winning the early stage engineering and design aspects of future programs or through a reduction in the level of future plant automation. Tower remains highly dependent upon the success of Ford and DaimlerChrysler, which represented 35% and 25%, respectively, of the company's revenues in 2001. Tower additionally has substantial exposure to a selected set of vehicle programs and therefore does not benefit from the security afforded by a high degree of contract diversification. As evidenced by Tower's 2002 weaker-than-expected performance, the company's business is highly cyclical due to the dependency upon consumer spending of automotive sales and production levels. Volume declines at Tower translate into even larger fall-offs in margins given the company's innately high degree of operating leverage. This remains the case even after incorporating the impact of the company's comprehensive restructuring and lean manufacturing cost-cutting efforts over the past couple of years. Tower continues to have a substantial amount of goodwill, which is the by-product of 14 acquisitions to date. Preliminary estimates for the cumulative transitional impairment charge that will need to be recorded effective as of January 1, 2002 range from $100 million to $200 million.

72.     Additionally, the report described issues that the fiduciaries knew or should have known were material to the determination of adequacy of the Company's common stock as an investment.  These issues, listed as "future concerns" in the report, were present throughout the Class Period, and their effects would increase as the Class Period continued.  The *Moody's* report provided as follows:

> Future events that would have potential negative implications for Tower's ratings include materially lower-than-expected production volumes for the company's critical platforms; steady loss of market share by Tower's key customers;

loss as an incumbent supplier of future replacement programs; cancellation or delay by OEM's of future programs; unforeseen operational difficulties encountered with the execution of future program launches; an inability of Tower to further diversify its customer base (unlikely in light of a growing relationship with Nissan, as well as with certain other foreign OEM's); the inability to reign in future capital investment; poor ongoing controls over working capital; or a significant new debt-financed acquisition.

73.     On July 19, 2002, Tower Automotive common stock dropped 15% on concerns that the Company was suffering significant production problems on certain production lines. A report issued by Credit Lyonnais securities analyst Charles Brady cited problems with the Ford Explorer, Lincoln Aviator sport utility vehicles, and DaimlerChrysler AG's Dodge Ram pickup production platforms. The report stated: "TWR is experiencing difficulties in North America with operational inefficiencies, launch problems and program delays." The previous day, defendant Campbell stated, during the conference call held in connection with its earnings release, that U.S. based customers were providing significant pricing pressures. Moreover, he indicated that the Company was "prepare[d] for the worst" in southern Europe and that Brazil had been a constant struggle as it was experiencing significant pricing pressures along with increases in steel costs in that region. Brazil was not the first location where the Company had experienced problems associated with steel prices, and it would not be the last. In fact, later in the Class Period costs associated with rising steel prices would significantly impact the Company in broader markets, including North America. Defendants knew or should have known that these underlying costs can have a significant impact on the Company's ability to maintain cash flow and the liquidity required to support the Company as an ongoing enterprise.

74.     On September 16, 2002, shares of Tower Automotive fell 8.6% after a Ford executive said that Ford was working with Tower Automotive to further reduce costs. Ford's

importance as a customer to Tower Automotive would, as it had in the past, continue to play a significant role in the performance of the Company throughout the Class Period.  In fact, Ford was Tower Automotive's single largest customer, comprising approximately 35% of the Company's revenues.  In an article published by *Reuters News* on September 16, 2002, Credit Lyonnais analyst Charles Brady was quoted as stating "People may have interpreted the comments made by Ford management as indicating that Tower was susceptible to pricing pressure and the cost savings realized by Ford may have been derived from Tower's profit margin."  The article also attributed a trade association with stating that automotive component suppliers, such as Tower Automotive, were under intense pressure from automakers to cut costs.

75.     On October 18, 2002, the Company announced earnings for the third quarter and nine months ended September 30, 2002.  Including the after-tax effect of one-time items, the Company reported a net loss of $115 million for the nine-month period, with the results impacted by higher-than-expected interest charges.  The Company ended the quarter with long-term debt of $511 million and total debt of $837 million.  This was a sequential increase from the prior period which the Company had ended with long-term debt of $434 million.  Despite prior efforts at reducing its leverage by paying down debt, the Company was still extensively leveraged.  The Company's leverage calculation ratio (total debt divided by earnings before interest, taxes, depreciation, and amortization) was 3.0 at the end of the third quarter of 2002, versus 3.6 at the end of 2000.  Its leverage percentage (total debt net of cash as a percentage of the total capital of the company) at the end of October 18, 2002, was 51%, compared to 57% at the end of 2000, when its debt levels hit their peak.  During a conference call held the same day in connection with the earnings announcement, the Company's Chief Financial Officer stated that the Company's

intention was to have the leverage percentage at 35-40% within three years.  However, the

Company never achieved this goal.  As the Company's leverage percentage would head in the

opposite direction than intended later in the Class Period, the fiduciary defendants failed to

adequately monitor the appropriateness of Tower Automotive's common stock and continued to

permit the Class to maintain and acquire shares in the Company's stock despite the significant risks

that the Company had been facing throughout the Class Period and the failure of the Company to

address the extensive risks which would certainly result in its seeking bankruptcy protection.

76.     During an October 18, 2002 conference call held in connection with the earnings

announcement, the Company announced that it was reducing its prior estimates for the fourth

quarter as a result of across-the-board reduction in demand it was experiencing among customers as

well as "the more realistic forecast of interest expenses."  Debt levels were a key concern during

the October 18, 2002 conference call.  The following discourse between Barone and Darren

Kimball, securities analyst for Lehman Brothers, reiterates concerns among analysts regarding

Tower Automotive's high debt levels and debt level management:

> Darren Kimball: just -- I have a question on cash flow. You guys keep
> talking about free cash flow as the 72 million that's in that slide -- 10 million on the
> quarter, 72 million year-to-date. And I look at your cash flow statement, and your
> cash from operations is 12 million -- I'm sorry, 19 million -- and if I take out the 108
> for cap ex, your operating cash flow -- at least the way I define it -- is negative 89
> million, which I think is probably the explanation to Steve's question about why the
> debt's going up. So, I'm trying to understand why you're calling EBITDA minus cap
> ex free cash flow.
>
> Anthony Barone: But, we're not calling it free cash flow. The s[l]ide [ ] says
> we're generating cash flow, and I think to Ron Tadross's previous question, the
> concern was that we're investing more going forward in this business than we're
> generating operationally.
>
> The point we're trying to make is that there is separation between our cash
> earnings and our capital investment. You then have -- to get to free cash flow, have

26

to take the other things off of the equation -- debt service being one. We have in debt service only the requirement from payment of interest that we're estimating to be about $64 million a year. And beyond that, it's the fluctuation relative to working capital changes, up or down, that for the quarter -- in any one quarter would be cyclically driven, whether we're good or bad. But, as we see it going forward on an annual basis, we see opportunities for improvement in working capital over an extended 12-month period.

* * *

Darren Kimball: Can you also just review your debt maturities going out over the next couple of years, and how much room you have on the covenant compliance situation?

Anthony Barone: Well, again, debt maturities -- we have probably the next due date for any refunding is on the subordinated ventures (ph) which is August of 2004. And then, I think we've got a term loan payment due in 2005, which is about 125 million on the term loan, so probably 50 million of the 125 would be due in '05, and then 75 in '06. Those are the scheduled maturities that we have. And the revolver facility itself -- originally, it was six year facilities. I guess it comes due in June of '06.

On our most restrictive covenant, we have availability of about $225 million as of the end of (inaudible).

77.     On November 14, 2002, J.P. Morgan securities analyst David Bradley issued a

report highlighting the ongoing concerns over auto sales as a result of weak economic conditions

and continued high-incentives that manufacturers were using in order to get consumers to purchase

automobiles.  In his research report, Bradley urged investors to avoid investing in companies with

high operating and financial leverage, including Tower Automotive.   Throughout the Class Period,

such incentives would dominate automobile manufacturers' competitive strategies for inducing

consumers to purchase automobiles.  These incentives to consumers ultimately resulted in extensive

pricing pressures on automobile parts manufacturers, including Tower Automotive, from the

automobile manufacturers.

78.     On December 17, 2002, Tower Automotive announced that it would not continue as a supplier for the frames for the next generation Ford Explorer.  In the Company's press release announcing this decision, defendant Campbell stated that the decision was "based strictly on the fact that the expected returns at targeted pricing levels did not meet our requirements."  This decision merely emphasized the ongoing problems that the Company had been experiencing with its Ford Explorer frame manufacturing plant.  In essence, the Company had admitted that it was unable to profitably manufacture frames for the Ford Explorer.  The implications as to the state of the Company's operations was significant considering the lengthy relationship between Ford and Tower Automotive and that Ford comprised approximately 35% of Tower Automotive's revenues.

79.     On December 30, 2002, a column entitled "Tower May Be Just the Beginning" was published in *Automotive News* casting a negative light on the economic outlook for the automobile parts supplier industry.  The article stated:

> This month, Tower Automotive Inc. did what some might consider suicide. It said it would not bid again on the Ford Explorer frame.
>
> Tower and a company it bought in 1997, A.O. Smith, have been making frames for the Explorer as long as there has been an Explorer.
>
> Everyone knows that you don't say no to an automaker - ever. And yet this may be just the start of a movement that will put even greater pressure on automakers and their suppliers.
>
> Someone out there, perhaps offshore, probably will be willing to build frames for Ford at the price Ford demands. But I can't help remembering that perhaps that was one of the problems with the Ford Explorer and the Firestone tire.
>
> Some tire makers chose not to supply Ford with tires for the Explorer because the suppliers felt they could not build a safe tire for the price Ford was willing to pay.
>
> There's something wrong when you discover that some suppliers won't even bid on a product for an upcoming automobile. If it's a safety-related item, it gets

tricky.

As suppliers are squeezed tighter and tighter, there will be a lot more that, like Tower, say no.

It has been a long time since a major supplier was willing to stand up and say that the price is too low.

On the other hand, with the fierce competition in the marketplace and the difficulty that any domestic vehicle maker is having raising retail prices, it could well be that the makers are caught between a rock and a hard place.

Suppliers have reached their bottom. There is little or no blood left in those turnips.

Manufacturers can't raise prices and they have to spend huge amounts of money in incentives to keep their market shares and volume.

It's going to get worse before it gets better.

There are so many pressures on suppliers that many of them are not going to be able to supply parts.

The business is in a bit of a mess these days, and it will take a strong economic recovery to get us on the right track again.

80.     On February 14, 2003, the Company issued a press release announcing financial results for the fourth quarter of 2002 and for fiscal 2002, which periods ended December 31, 2002. The Company reported increased sales and earnings for both periods and an improved balance sheet versus the prior year. For the quarter, the Company reported revenues of $681.6 million and net income of $17.3 million.  The Company had made net repayments of debt of $159 million for the year, resulting in a 53% leverage ratio.  Nevertheless, the Company sustained a net loss for fiscal 2002 of $97.6 million.  Commenting upon these results, Defendant Campbell stated, in pertinent part:

Our long-term enterprise objectives continue to be the generation of free cash flow to strengthen our balance sheet, to improve our returns on the capital we

employ in the business, and to win attractive new business. When we take a look at 2002 as a whole, although we have made significant improvements, we are not completely satisfied with our progress to date on some of these objectives. ***We will continue to focus on reducing our capital intensity and generating additional cash.*** We maintain a backlog of $1.4 billion of new business, two-thirds of which will be launched by the middle of 2004, and over half of which will run on existing capacity.   (Emphasis added.)

81.   On March 17, 2003, Tower Automotive shares fell sharply after Ford announced that it had cut its second quarter production by 17%, amidst sluggish demand

82.   On March 27, 2003, *Moody's* lowered Tower Automotive's liquidity rating to SGL-3, from SGL-2.  *Moody's* also lowered its credit rating outlook to negative, from stable.  The accompanying report cited "material deterioration of the company's near-term liquidity profile driven by several factors."  Among the factors noted included the Company's drawing down of a revolving credit facility to finance a stock buyback program, the violation by the Company of its leverage covenant in the event that vehicle production volumes decline, and significant demands for cash to support new program launches.  The report stated the following with regard to the potential impact from a decline in light vehicle production:

> Moody's lowered Tower's rating outlook to negative, from stable, due to concerns regarding the potentially negative impact that a decline of North American light vehicle production volumes below 16 million units could have on Tower's near-term cash flow generation capabilities and access to liquidity. Given the company's high proportion of fixed operating expenses, combined with its very substantial requirements to invest in growth, a meaningful decline in unit volumes would likely cause Tower to realize negative 2003 free cash flow and could additionally lead to the company's violation of the leverage covenant per the senior credit agreement. Under such a scenario, the company's access to cash could fall short of the level necessary to operate the existing book of business while also covering the research, tooling, launch expenses, and capital expenditures necessary to support new business awards. Moody's therefore expects that Tower will have to step up its degree of reliance upon external sources of financing over the next year. However, Tower's existing bank covenant limitations restrict effective availability under Tower's $600 million revolving credit. Tower's access to other alternative financing solutions could also be limited, given the company's extremely low current stock

price and market capitalization, as well as the presently unpredictable high yield bond market.

* * *

Future events that could drive Tower's ratings lower include escalating liquidity concerns which would most likely be generated by a material decline in production volumes, evidence that Tower's mix of larger programs is unfavorable, higher-than-expected investment levels for new programs, and/or problematic launches. Indications that Tower is experiencing declining market shares or is in pursuit of substantial near-term acquisitions could also drive ratings lower. Tower's rating outlook would likely stabilize in the event that North American production volumes can be maintained at 16 million units or better, the company achieves some debt reduction through divestiture of certain non-core assets, Tower demonstrates an ability to tightly control capital spending and launch costs in the event that production volumes do actually decline meaningfully, and/or a bank amendment is executed to loosen future financial covenants.

83.     On April 22, 2003, the Company issued a press release announcing financial results for the first quarter of 2003, the period ended March 31, 2003. The Company reported revenues of $733 million and net income of $12 million, or $0.21 per diluted share for the quarter. The press release quoted Defendant Campbell, who stated in pertinent part:

While sales were up compared to last year, softening in certain platform volumes tended to offset strong Dodge Ram, Ford Expedition and Cadillac CTS sales. Our focus for 2003 is to ensure the new Volvo, Nissan and GM launches are flawless, and at the same time implement swift countermeasures to mitigate the impact of any further reduction in customer production releases

84.     During the conference call held in connection with the first quarter 2004 earnings report, defendant Campbell expanded upon the continued manufacturing problems related to the Ford Explorer frame:

And where we're at is that the frame production for the Explorer is still not at planned levels of cost. Although certainly, compared to last year, performing much better. I reported to you in February that we have the constraint issue resolved, and we can routinely produce 39 jobs an hour down the final assembly line which is the design capacity for that line. The plan for this year was to use our new manual

31

offline operations to basically supplement the automatic front and rear build stations, while we worked on improving their throughput.

So this was sort of an intermediate, help out these slower performing upstream operations. But the fact of the matter is we have not been able to get those automatic stations to work any faster and, therefore, we need to run the manual stations more than we planned, which is more costly than we planned. Especially when the volumes are strong, which they were in February. I went down a [inaudible] couple of weeks ago to have a look at the progress and to see what else could be done or was being done and concluded, unfortunately, that while there are still things we can do to decrease cost, [inaudible] in the incremental range rather than something dramatic going forward.

85.    In addition, defendant Campbell acknowledged that liquidity was a key concern of the market.  During the above-described conference call, defendant Campbell commented on liquidity concerns:

The next area is liquidity. That seems to be on everybody's mind and they're worried about it. But don't. We had $117 million availability at the end of the first quarter and we will be in compliance throughout the year. The most restrictive covenant crank, down to 3 1/2, or cranks down to 3 1/2 , at the end of Q2 and we have plans, and place to ensure that we will have at least the same level of liquidity as we had in Q1 throughout the rest of the year. We're also looking at -- I was look at ways to improve the cushion. We're looking at underperforming resources really in every category as well as working with our customers to get more front consideration, for example, on things like capital investments that are really project-specific in nature, much like tooling, and being handled in the same way as tooling.

So, in addition, we're looking at our overall debt structure to make sure it's optimized for both the short and the long term. So that's something that is ongoing as well.

86.    During the conference call, Ernie Thomas, CFO, discussed the Company's debt and liquidity position.   These figures indicated that the Company continued to struggle, for the worse, with its liquidity position.  He summarized the positions as follows:

In terms of liquidity, total capacity of $600 million is unchanged since the fourth quarter of '02. **We did increase our drawdown of the revolver by $65.8 million up to $243.1 million.** Unused capacity $356.9 million. For a total liquidity of $375.7 million. That's down against $436 million in the fourth quarter of '02. Our

strictest covenants we had $116 million available as of the end of the first quarter of '03. We expect, again, to maintain at least that amount going forward throughout the year. Just a word about the takedown in availability from 239 at the end of Q4 of '02, **part of that change was due to a tightening of the covenant requirement, roughly $63 million, and part was due to a change in the increase in debt, roughly $65 million.** So those two together account for the $123 million change availability, fourth quarter '02 versus first quarter of '03.

Page 10. Shows our total capitalization. **The big issue here is we had an increase in our total debt due to the lack of free cash flow in the first quarter, basically. Debt to capital stood at 54% as of the end of first quarter of '03 versus 53% as of the end of '02, and 60% as of the end of first quarter of '02.** [Emphasis added]

87.     Despite defendants' awareness that the extensive leverage of the Company, heavy debt-load, and liquidity concerns made investments in the Company stock an extremely risky proposition, defendants engaged in a campaign to minimize such issues and concerns and continued to permit the Plans, and members of the Class, to retain and acquire the common stock of Tower Automotive.

88.     During the conference call, the Company held a question and answer session.  The following exchange took place between Stephen J. Girsky, a securities analyst for Morgan Stanley, and defendant Campbell which highlights the overarching lack of control and certainty within management regarding the administration and governing of the Company's operations:

Stephen J. Girsky: Uh-huh. And let me ask you, did we change anything at the Explorer plant? I mean, where's the accountability here? Is there anything that could suggest to the outside world that things are being held accountable.

Dugald Campbell: Yes, you will hear about changes being announced later today in terms of leadership changes to demonstrate and to respond to the accountability. It doesn't change the fact that there are still -- there is still a major fundamental issue with that line that, without further investment, with two years left to run, doesn't make a lot of sense. We will approve [sic, should be "improve"] the situation, and we will approve [sic, should be "improve"] it with leadership that's absolutely focused and adhering to the cost-down expectations. So two things are

happening: Leadership will be improved, and more attention to the detail in the cost. The dramatic changes in the line will not be forthcoming.

Stephen J. Girsky: We've got to suffer with two years of a loser out here or how does it resolve itself?

Dugald Campbell; It's not a loser. It's not performing to the expectations that the line was designed for.

Stephen J. Girsky: Your guidance suggests that the second half of the year, there's not going to be much money made at this company. Using your math, it's somewhere between 4 cents and 15 cents a share for the entire second half of the year. So what is it? I can read down this list. Is majority volume, you're basically suggesting volume is going to be basically a disaster in the second half of the year?

Ernie Thomas: It's really a combination of lower volume and heavy spending on launch costs in the latter half of the year. Back to the Explorer, it's actually better than it was a year ago. It's not up to our expectations, but it's better than a year ago. The through put is better. It's not up to expectation, but it's improved over a year ago.

Stephen J. Girsky: Why is pricing and economics, which seemed to be favorable in Q1, Q2, why does it become unfavorable in the second half of the year?

Dugald Campbell: We've got some negotiation underway and we expect to get back price in the latter half of the year. That's what that is. And the first part of the year, we had some one-time adjustments for some material changes that affected that favorably in the first part of the year that won't occur in the second part of the year.

89.    The exchange between the same analyst and defendant Campbell reflected the

seriousness of the concerns over the Company's continued viability due to its significant debt load

and its lack of cash flow necessary to sustain its operations:

Stephen J. Girsky: So we should assume the same. So do you think you've got enough -- you said yourself the cash flow's negative here, right? And we've got $200 million coming due next year. I mean, how much do we have to pay off? What's our needs -- our liquidity needs next year besides operation?

Dugald Campbell: Well, we should start to see some free cash flow in the second half of '04. So I'd think in the second half of '04 as the volume and earnings

pick up, we should start to see some free cash flow. Now we do have the convertible coming due in August. We have room in the revolver to take the convertible out next year. And to be honest, we are also looking at some long-term possibilities for capital structure in terms of debt. So we expect to be able to take our convertible and also have sufficient liquidity throughout '03 and '04 to meet our needs.

Stephen J. Girsky: Uh-huh. All right. Thank you.

90.     Further discussions during the conference call between David Leiker, securities analyst for Robert W. Baird, and defendant Campell, and between securities analyst Nadav Braun of CRT Capital and Dave Tuitt, Investor Relations and Treasurer for Tower Automotive, highlight the extent of the Company's leverage position and the extreme risks associated with the Company even considering its relatively positive outlook.  The following discourse evidences how far out on a ledge the Company would persist:

David Leiker: Okay. And then, Ernie Thomas, I think you made the comment you expect to be generating free cash flow the second half of '04.

Ernie Thomas: Yes.

David Leiker: I interpret that to mean that your debt isn't going to decline at all over basically the next 12, 15 months. Is that fair?

Ernie Thomas: That's fair.

David Leiker: And what a step up in your -- or step down in your coverage ratio show, the EBITDA to 3 1/2, your availability in your credit facility right now is $116 million. How do you get that to $200 million next year?

Ernie Thomas: The credit agreement allows us some flexibility, and we plan to take as a result full advantage of that and also just prudent management of working capital. The capital expenditures, timing of those, we expect to take actions. Also, some of the savings we haven't talked about yet will help us to maintain liquidity.

* * *

Nadav Braun:  I know there's been focus on capital restructuring and I'm shore [sic] to return to this point. You've mentioned a couple of near-term fixes that you're looking at. But given the level of spending that you have on launch costs in

the latter half of the year, it's very difficult for me to see how you're able to maintain compliance over the sort of next year, year and a half.

Obviously, you need to be in compliance in order to use your revolver to pay down the convert notes. I'm wondering, you know, what types of discussions you've had with you your banks, and what types of discussions you've had with other sort of financing, high-yield or any other types of mezzanine financing here. If you could speak to that, it just looks as if you're going to have a fairly significant liquidity problem later in the year or early in '04.

Dave Tuitt: Well, we don't expect to have a liquidity problem, but we are up front with our banks, and our banks know our situation. And we've explained everything to them. And if we had to do an amendment, we could get an amendment, that would not be a problem. We have talked with several different sources regarding the long-term issue of having an appropriate capital structure that matches long-term financing needs with long-term availability of financing. And those are ongoing. And, you know, we're going to move relatively quickly in decide… [sic] long-term strategy, which will address both the short-term issue you mentioned, as well as the long-term financing issue.

91.     Finally, during the conference call defendant Campbell acknowledged the liquidity concerns of the Company:

Let me say we have a short-term issue with maintaining liquidity, there's also the long-term structure of the balance sheet and we have a lot of reliance on short-term financing. We need to address that issue relatively quickly. So we're looking at alternatives to get a long-term focused debt structure in our balance sheet. And we're looking at alternatives at the present time to do that.

92.     On May 28, 2003, the Company announced that it intended to offer an aggregate of approximately $250 million of senior notes due 2013.  The Company stated that it would use the net proceeds from the offering to repay amounts of outstanding debt under its senior credit facility and for general corporate purposes.  This transaction was completed on June 6, 2003.

93.     On June 18, 2003, the Company announced that its wholly owned subsidiary, R.J. Tower Corporation, had successfully completed an amendment to its senior credit facility which will enhance the Company's overall liquidity and provide flexibility to redeem its $200

million convertible subordinated debentures prior to maturity on August 1, 2004. The Company agreed to grant security to its lenders in certain assets of R.J. Tower and to reduce total borrowing capacity under the facility by $125 million in conjunction with the amendment, which also included more flexible financial covenants.

94.     On July 22, 2003, the Company issued a press release announcing financial results for the second quarter of 2003, the period ended June 30, 2003. For the quarter, the Company reported revenues of $743 million and a net loss of $2 million, or $0.04 per diluted share. In the press release, Defendant Campbell commented on the results, in pertinent part:

> For the quarter, we converted well on higher than expected sales. We also generated $112 million of cash from operations, which exceeded our capital spending of $58 million for the quarter. Our recent debt restructuring has improved the financial flexibility of our enterprise and our launch activity is on track.

95.     On August 13, 2003, the Company issued a press release that then CFO Ernie Thomas had resigned, effective the same day.  Thomas had only joined the Company in that capacity in November 2002.

96.     On August 19, 2003, the Company announced that it had to record an additional $258.8 million in debt that it had previously kept off its balance sheet.

97.     On October 15, 2003, the Company announced that it was revising its outlook for the third quarter ended September 30, 2003.  The Company lowered its expectations for revenues for the quarter from the range of $640 million to $650 million to approximately $620 million.  The Company further forecasted a loss for the quarter of $1.78 per share versus the previous guidance of a loss between $0.16 and $0.24 per share.  The Company blamed labor disruptions at Hyundai and Kia facilities in South Korea and charges related to the transferring of production of Ford Ranger frames from its Milwaukee plant to an Ohio factory.  An article published on October 16,

2003, in the Detroit Free Press, entitled "Tower Says 3rd Quarter Loss Bigger; Soon-To-End

Contract With Ford Hurts Supplier," focused on the troubles experienced by Tower Automotive as

a result of its heavy reliance on Ford as a customer:

> The company is giving up the Explorer business because it says Ford isn't paying enough for the parts. The business, which is expected to end by mid-decade, is one of Tower's biggest contracts. The Explorer accounts for a big chunk of Tower's annual revenue. The company lost $97.6 million in 2002, on revenue of $2.75 billion.

> Marc Santucci, a supplier industry analyst at auto consulting firm ELM International, said Ford is the root of many of Tower's woes.

> "The biggest problem is they are a big Ford supplier and Ford hasn't done that well," Santucci said. "As Ford goes, Tower goes."

> The automakers also routinely demand that suppliers cut their prices, and that also hurts the bottom line, experts say.

> Ford made up 38 percent of Tower's sales last year.

> Other charges against earnings include $4.4 million, or 5 cents a share, related to the previously announced retirement of chief executive Dugald Campbell and $3.3 million, or 4 cents a share, for an equipment failure that disrupted production at its Plymouth factory.

98.     On October 21, 2003, Tower Automotive announced a series of organizational

changes in its North American operations, including consolidating its North American product

groups, changes to its leadership team and moving its enterprise headquarters.  Commenting on this

reorganization effort, just one of many in the Company's difficult history, new CEO Ligocki stated,

without any revealed basis considering the Company's financial position and the economic

environment, "[i]n the next few years, we will enjoy tremendous revenue growth in all our

regions."

99.     On October 23, 2003, the Company issued a press release announcing its financial

results for third-quarter 2003, the period ended September 30, 2003. For the quarter, the

Company reported revenues of $623 million and a net loss of $101 million, or $1.78 per diluted

share. The press release included comments by  Defendant Ligocki, who stated in pertinent part as

follows:

> Tower Automotive faced several challenges during the third quarter, including the impact of lower sales volumes related to labor disruptions at Hyundai and Kia facilities in South Korea. We also recorded significant asset impairment charges to align the company's balance sheet with our current business plan. We are in the midst of several major program launches, which underlie our revenue growth over the next few years, and our top priority for our customers and shareholders is to deliver on the promise that growth represents.

Concerning the Company's outlook, the press release stated, in pertinent part, as follows:

> The company expects fourth-quarter revenues to be between $680 million and $700 million, which would result in revenues for the full year 2003 of approximately $2.8 billion. The company expects a net loss in the fourth quarter of approximately $0.26 per share on a GAAP basis, including pre-tax asset impairment and restructuring charges of $12.0 million, or $0.14 per share on an after-tax basis, that the company expects to record during the quarter. For the full year 2003, the company expects a net loss of $1.88 per share on a GAAP basis.

> The company expects fourth-quarter EBITDA, a non-GAAP measure the company defines as earnings before interest, taxes, depreciation and amortization, and noncash restructuring and asset impairment charges, of between $50 and $60 million, which would result in full-year 2003 EBITDA of between $240 and $250 million (a reconciliation of EBITDA to net income is attached in Table A).

> In addition, Tower Automotive revised its outlook for capital expenditures. The company now anticipates capital expenditures for 2003 will be approximately $240 million, compared to previous estimates of approximately $200 million. This increase is primarily associated with additional spending at the company's new facility in Ford's supplier park in Chicago. Tower Automotive continues to anticipate that revenues will grow between 12 percent and 15 percent from 2003 to 2005.

100.    The same day, the Company held a conference call in connection with its earnings

announcement.  Therein, it announced that it anticipated capital expenditures for 2003 of about

$240 million, rather than the $200 million previously estimated.  During the question and answer

session, Dave Tuitt stated the following in response to a question concerning the  cash flow of the

Company and the impact of the additional debt that had been off balance-sheet:

> Cash burned in the quarter, and I guess I (inaudible) the word burn but is
> negative. For the quarter, if you look at slide 20, our cash flow from operations was
> $27 million in the quarter. Cap ex was $81 million, so it's a negative pre-cash flow
> of $54 million which is pretty much exactly what our net change in cash and debt
> was during the quarter. It's a little hard to reconcile debt change to our cash flow
> right now because we have both our revolver and our cash going up and down. At
> the end of the quarter, we happened to not have anything proud on our revolver. We
> had about $25 million last quarter. We have to take the net of those two amounts. In
> regards to off balance-sheet items, I'm glad you asked me. This way, nobody will
> have to call me all day asking this. The AR securitization was about $15.9 million at
> the end of the third-quarter, the net present value of the operating lease we have
> which would be secured off balance-sheet financing is $291 million and the
> EBITDA add back, i.e., the additional hit to EBITDA about having the (ph)
> operating lease instead of finance in normal operations is $60 million on a LTM
> basis.

101.    On December 23, 2003, *Moody's* lowered Tower Automotive's liquidity rating to

SGL-4 from SGL-3, stating that Tower Automotives near-term liquidity position had deteriorated

to "weak" from "adequate."  The report issued by *Moody's* in connection with the downgrade

provided the following basis for the downgrade:

> The lowering of Tower's speculative grade liquidity rating to SGL-4 reflects
> Moody's current expectation that Tower's liquidity (defined as "cash plus effective
> unused availability") will likely fall materially below $100 million during the first
> three quarters of 2004, due to negative free cash flow generation during the period.
> The company will continue to be challenged through the latter part of 2004 by its
> commitments for contemporaneous execution of a series of significant new program
> launches. These include launches for the Nissan Titan/Armada (frame), Cadillac
> SRX/STS (powertrain module), Volvo S50/V50 (body structures), Ford
> Freestyle/Five Hundred (body structures), Nissan Pathfinder/Xterra (frame), BMW
> 1&3 Series (body structures), and DaimlerChrysler New Dakota (frame). Tower's
> operations were additionally disrupted during the latter part of 2003 by
> announcements of major changes to its senior management team, which included
> changes in the company's chief executive officer and chief financial officer.
> However, the selection of Kathleen Ligocki as CEO and the other management

changes are aimed at developing best practices to better focus and integrate Tower's operations, establish shared services, even out performance, and create more flexible manufacturing systems.

Inefficiencies to this point have caused the associated launch costs to meaningfully exceed original estimates. The company notably has been managing through a compressed launch schedule for the Nissan Pathfinder/Xterra. In addition, Tower recently increased its capital spending estimates for 2003 to $240 million, from $200 million, which represents a substantial use of additional cash. Most of the increase in capital spending is associated with engineering and content changes related to the Ford Freestyle, along with assumption of another supplier's work related to this program. A portion of the additional expenditures will eventually be recouped through the piece price. Tower's reimbursable tooling balance as of September 30, 2003 had grown to almost $200 million, but about $172 million of that balance was owed to the company's own suppliers.

The third quarter of 2003 also proved to be a tough operational quarter for Tower. The company endured a labor strike in Korea, an equipment failure at the Plymouth, Michigan facility, and disruption and additional costs associated with executive retirement and recruitment. An incremental $124.5 million of restructuring and impairment charges were recorded during the third quarter, but the bulk of these charges were non-cash in nature. Throughout 2003, Tower experienced the negative impact of lower production levels and a less favorable revenue mix.

Tower is in the process of finalizing the legal work necessary to pledge additional inventory and receivables collateral to support the senior secured credit agreement. It is fully expected that the revolving credit facility will be secured at that point and that the commitment will be increased by $200 million, to $316 million, in order for Tower to refinance its $200 million of convertible subordinated notes. The substantial portion of all of the company's tangible domestic assets will be encumbered at that point.

Tower will remain reliant during 2003 upon its external financing commitments to offset the significant cash outflows that will continue to be necessary to support the company's launch of its book of business. Moody's notes that the company requires a base level of cash of $10-15 million in order to operate. In addition, a total of about $110 million of open letters of credit reduce unused bank availability. Due to customer concentration issues, the company can consistently only use $30-$35 million of its $60 million maximum accounts receivable securitization facility. The bank financial covenants tighten significantly after the conclusion of 2004.

102.     On January 19, 2004, the *Crain's Detroit Business* published an article entitled

"Ligocki: Tower May Sell Units; New CEO Cites Cash-Flow Problems, Debt Load" that stated, in

part:

> Tower Automotive Inc. CEO Kathleen Ligocki said the company may sell
> some businesses as it tries to boost cash flow during a critical year for the company.
>
> Novi-based Tower has capital-spending commitments this year as it launches
> new products for Ford Motor Co. and Nissan Motor Co. But the company also
> carries a heavy debt load from acquisitions. Tower's long-term debt was $996.6
> million as of Sept. 30. The company manufactures automotive body structures and
> chassis systems and reported revenue of $2.1 billion through the first nine months of
> last year.
>
> New business and operational improvements might not be enough to reach
> cash-flow targets this year, Ligocki said last week during an interview at the
> Automotive News World Congress in Dearborn.
>
> ``For the last quarter of (2003) and the first quarter of (2004), we'll have
> negative cash flow as we invest for new projects,'' she said. ``Then we turn that work
> into cash flow. That may not be enough. We may need to look at incremental
> financing measures ... such as divesting some businesses.''
>
>                                    * * *
>
> Fitzgerald said smooth launches on the Ford and Nissan projects are
> important for Tower because it needs to show it can generate cash flow and profits
> on new business. Poor launches hurt suppliers, especially capital-intensive ones like
> Tower, because the extra cost wipes out any profit margin. Tower reported $240
> million in capital expenditures in 2003.
>
> The company reported an operating loss of $74.4 million through the first
> nine months of last year, which included $147.6 million in restructuring and asset
> impairment charges.
>
> ``Because their margins are thin and the balance sheet is not strong, their
> ability to buffer a problem is less than it was three to four years ago,'' he said. ``The
> cost to manage a bad launch can literally exceed the first-year sales value. There's no
> way to recover that, and it can turn a thin-margin program into a negative one.''

103.     On February 12, 2004, a Company press release announced financial results for

the fourth quarter of 2003 and fiscal 2003, which periods ended December 31, 2003. For the

quarter, the Company reported revenues of $717 million – a net loss of $25 million, or $(0.43) per

diluted share.  EBITDA for the quarter had declined 14.1% as compared to the same period  in

2002.  The Company's EBITDA for the year had decreased 56% versus the prior year.  This was a

six year low.  The press release included positive comments by defendant Ligocki, who stated, in

pertinent part:

> In the fourth quarter, we saw stronger volumes overall, which led to better
> than expected operating results. While our operating performance exceeded
> expectations, our reported results were impacted by several items, including a write-
> down to market value of a publicly traded joint venture. Looking forward, our top
> priorities for 2004 continue to be keeping our launches on-track while focusing on
> cash flow and continuing to make fundamental improvements in operations.

Concerning the Company's future outlook, the press release continued in pertinent part as

follows:

> The company expects an increase in full-year 2004 revenues to
> approximately $3.2 billion, up from $2.8 billion in 2003, reflecting the addition of
> several new programs. Earnings per share are expected to be in the range of $0.25
> to $0.40 per share for 2004. First quarter 2004 revenues are expected to be
> between $760 and $770 million, and earnings are expected to be a loss of between
> $(0.07) and $(0.03) per share for the quarter.
>
> The company anticipates that EBITDA for the full year 2004 will be
> between $270 million and $285 million, including EBITDA of approximately
> $55-60 million in the first quarter of 2004. Net capital expenditures are
> expected to be approximately $195 million for the full year 2004.
>
> The company's estimates for earnings per share and EBITDA exclude
> restructuring charges, which are expected to be approximately $0.01 to $0.02 per
> share per quarter based on previously announced restructuring activities.

104.    In connection with the earnings announcement, the Company held a conference

call on February 12, 2004.  Contrary to statements made earlier in the Class Period that the

Company would not be impacted by steel price fluctuations,[1] the Company acknowledged that it

was experiencing unexpected costs associated with steel prices.  During the conference call,

defendant Ligocki stated, in part:

> We are beginning on steel to see some surcharges like many of our
> companies [sic]. Demand increases in Asia primarily in China are creating
> surprise shortages worldwide. . . . We our protected on a significant portion of our
> buy, about 60% of the steel is bought through re-sale programs with our OEM
> customers and we do already have agreed upon long-term contracts covering the
> majority of our European buy but significant price increases or surcharges or
> shortages would be a risk to our plan.

Defendant Ligocki also commented on the liquidity of the Company, ostensibly setting

forth a map for the Company's 2004 performance, requiring more than near perfect execution by

the Company for its survival.  Defendant Ligocki stated, in part:

> As we have stated before, during 2004, we will use cash during the first
> half of the year, and generate it during the second half of the year. This is due to
> the launches, which are occurring during the first half.

> On Chart 14, you can see that we finished the year with $161 million of
> cash. The current portion of debt is 300 million, which includes, 200 million of
> convertible notes which become due in August.

> We'll discuss the converts shortly. At the end of the year, with the net
> present value of leases which do not appear on the balance sheet of $360 million.
> This is up slightly due to leasing activity during the fourth quarter.

> On Chart 15, you can see that our liquidity position at the end of the year
> was 170 million, which is a combination of our cash on hand, and our borrowing
> availability. At the end of the year, we were tightest on our leverage covenant.

> However, the covenant relaxes in the next two quarters under our current
> credit agreement, and those quarters were expected to be the tightest all along.
> This will be using cash during the first half, will be tighter on liquidity in the next
> two quarters before it improves, but we're confident that our business plan as well
> as other actions that we are considering will give us sufficient liquidity cushion

---

[1] During the conference held on April 22, 2003, in connection with the reporting of its financial results for the first
quarter of 2003, defendant Campbell stated that "[m]ost of our steel purchases is in customer steel buy programs so
any impact is minimal in raw materials pricing."

during the year, and get us through to the second half where we anticipate improvement in cash flows.

105.    In addition to the extensive risks associated with investments in the Company's common stock caused by the Company's high debt burden, low liquidity and capital intensive business model, defendants were now forced to acknowledge that the risk to the Company was even greater than ever before due to the surging growth in the price of steel.  Defendants were aware that this threat could be particularly devastating to the Company given the low-margin business that it was in.  Yet, despite these indicators, all suggesting that investments in the Company's common stock were in inadequate for the Plans and the Class, defendants continued to permit the Plans and Class members to retain and acquire Tower Automotive common stock.

106.    On March 9, 2004, Credit Suisse First Boston's securities analyst, Chris Ceraso, issued a report stating that higher-than-expected launch costs due to surging steel prices could affect the costs of the Company's near term launching of the Ford 500 and Freestyle programs. The report stated that "the steel situation looks to be getting worse not better, and although Tower's exposure to directly purchased steel is limited (particularly in North America), rising prices could pose a risk."  The significance of the potential impact on the Company's operations was understood by defendants throughout the Class Period.  Moreover, it was of greater significance than ever during the 2004 year as the increasing price of steel came at a time of crucial product launches that defendants held out as key to the Company's future plans.  The rising costs of steel would play a pertinent role in the Company's demise as it impacted the ability of the Company to launch its new product lines and created additional strain on the Company's already tight balance sheet by increasing the capital expenditures needed to role out the new products and increasing the costs of the products – products whose margins were

already thin.   By this time, the Company had clearly been an inappropriate investment due to the high risks associated with its financial and operating conditions.   But, clearly, rising steel costs, among other factors, had derailed the "plan" for the Company's future.   Yet, despite defendants' knowledge of the Company's continued deterioration and declining prospects, defendants continued to permit the Plans and Class members to acquire and retain shares of Tower Automotive common stock.

107.   On March 8, 2004, the Company issued a press release announcing a restatement of its fourth quarter and full-year 2003 results, resulting in a wider net loss than previously reported. Despite this clear indication of the Company's continued deterioration and declining prospects, defendants continued to allow the Plans and Class members to acquire and retain shares of Tower Automotive common stock.   The press release stated, in pertinent part:

> Tower Automotive previously announced its fourth quarter 2003 results in a press release dated February 12, 2004. Those results included an extraordinary gain at its Metals joint venture in Mexico of $9.1 million, related to a tax planning transaction at the venture. ***The recognition of the gain had initially been determined by the company's independent auditors and accepted by the company. Upon further review by the independent auditors, the initial position was changed and the auditors concluded and the company agreed that under accounting principles generally accepted in the United States, the recognition of this gain should be deferred and recognized on a quarterly basis based on the joint venture's taxable earnings. Accordingly, the company has reversed the previously reported extraordinary gain and is recognizing a portion in the fourth quarter of 2003 as additional joint venture equity earnings of $1.2 million, offset by additional deferred tax expense of approximately $0.4 million in the quarter.*** This change has no effect on the company's previously reported operating loss or cash flows for the fourth quarter or year ended December 31, 2003.
>
> ***As a result of reversing the previously reported extraordinary gain, the company's fourth quarter 2003 net loss is now $33.0 million, or $0.58 per share, versus a previously reported net loss of $24. 7 million, or $0.43 per share.*** The company's net loss for the twelve months ended December 31, 2003 is now $124.7 million, or $2.20 per share, versus a previously reported net loss of $116.4

million, or $2.05 per share.

[Emphasis added.]

108.    On April 29, 2004, the Company issued a press release announcing its financial results for first-quarter 2004, the period ended March 31, 2004. The Company reported revenues of $781 million and net income of $12.0 million, or $0.21 per diluted share. The press release included comments from Defendant Ligocki, who stated in pertinent part as follows:

> Our first quarter results demonstrate our dedication to launching our new business awards successfully, while driving fundamental operational improvements across the company. We are pleased we were able to exceed our earnings goals in the face of challenging market conditions.

The press release  also announced a refinancing plan, further stating as follows:

> ***Tower Automotive also announced today that it is pursuing a refinancing plan with financial institutions that, if consummated, would improve the company's financial flexibility by extending debt maturities and increasing available liquidity.*** As currently envisioned by the company, the refinancing plan would include a new senior secured credit facility as well as a capital markets transaction which, when taken together, ***would provide sufficient proceeds to repay the company's existing credit facilities; refinance the company's 5% Convertible Subordinated Notes due August 1, 2004; and build additional liquidity for the company.*** The company expects the refinancing to be completed prior to the end of the second quarter. There are no assurances that the refinancing plan will be consummated.

> "The refinancing, if consummated, will give Tower Automotive a much more workable debt structure and will provide the financial flexibility appropriate for not only the upcoming period of launch activity, but also for the significant free cash flow we expect to generate in the second half of 2004 and beyond," commented Ligocki.

Concerning the Company's future outlook, the press release stated, in pertinent part, as follows:

> The company expects full year 2004 revenues of approximately $3.2 billion, up from $2.8 billion in 2003, reflecting the launch of several new programs. As a result of the recent divestiture of the company's investment in Yorozu, earnings per share are now expected to be in the range of $0.25 to $0.30 per share for 2004. Second quarter 2004 revenues are expected to be between $770 million and $ 790 million,

and earnings are expected to be between break-even and $0.06 per share for the quarter.

The company continues to anticipate EBITDA for the full year 2004 of between $270 million and $285 million, including EBITDA of approximately $65 million to $75 million in the second quarter of 2004. Capital expenditures continue to be expected to total approximately $240 million for the full year 2004.

109.    In connection with the earnings announcement, the Company held a conference call on April 29, 2004.  Commenting on the Company's debt levels at the end of the quarter, Jim Mallak ("Mallak"), CFO, stated:

We closed the quarter with debt on our balance sheet of 1 billion 324 billion. In addition, you will remember that we carry a significant level of operating leases, which are not reflected on the balance sheet. At the end of the quarter, the net present value of these leases equaled 344 million, which adjust our debt level on a pro forma basis to 1 billion 668 million. Our liquidity level at the end of the quarter was 101 million. We ended the quarter with 78 million of cash on hand, and 23 million of untapped revolver, which we had, access to if so needed. . . .

110.    Also during the conference call, defendant Ligocki stated that high steel prices resulted in net costs for steel that were $1 million more than the Company had planned.  Defendant Ligocki acknowledged that the impact of high steel prices would be greater in the second and third quarters, but declined to give estimates.   In particular, defendant Ligocki,  Mallak and Chris Ceraso, securities analyst for Credit Suisse First Boston, had the following exchange during the conference call:

CHRIS CERASO: OK. And then last item, you mentioned in the slide deck, which is very helpful, by the way, that you referred to steel as a crisis. But only you have a net hit to the operating line of a million. Does that, you know, is that telling us something that you're nervous that the effect of steel is going to worsen later in the year or what's behind the term steel crisis?

KATHLEEN LIGOCKI: We'll see a bigger impact in the second quarter and third quarter on steel, just because we were working on inventory in the first. The good news is that the futures on scrap steel are coming down, so a lot of us are hopeful that that means there's an end in sight to what we have right now, but we

won't know that. I think for a lot of it, it's characterized because of all of the effort that it's taken to manage steel, both from a price standpoint and supply standpoint this quarter and some of that is still going on both with us and our customers. Certainly occupied a few people's time this quarter. We were able, with a lot of work, to mitigate part of the impact, but we're still managing it this quarter as well.

CHRIS CERASO: So if it was a million in the quarter, can you take a stab at what it will be for year?

KATHLEEN LIGOCKI: We talked a little about that.

JIM MALLAK: There's a lot of plusses and minuses that can go into that because of - we tend to think of it as a net number, where scrap prices are going to go and scrap will drive the actual steel price as well as we are negotiations with some customers, so I think it's just real fluid for the rest of the year on that. Yes.

111.    On May 18, 2004, Tower Automotive completed the pricing of a private offering of

$110 million of 5.75% convertible senior debentures.

112.    On June 30, 2004, World Market Research Center ("WMRC"), a leading global

provider of business-critical information, published an article entitled "Steel Prices Cause Havoc in

US Component Supplier Industry."  The article stated:

Rising steel prices are cutting into component suppliers' already thin profit margins and will force some small and medium-sized companies into bankruptcy.

WMRC Perspective

Significance
 Demand for raw materials from China has pushed the price of rolled steel up by 57% to US$617 in June from US$350 in January. Higher steel costs are halving many suppliers' already thin profit margins, encouraging more suppliers to shift production overseas, while others sit it out.

Implications
 The Big Three automakers have set up steel resale programmes to ensure that suppliers obtain the steel they need. Suppliers have begun researching steel substitutes for some components to reduce their exposure to steel price swings and are pushing for US government intervention to force the steel industry to lower prices.

Outlook

Chinese government intervention to slow industrial expansion has caused scrap metal prices to level off and steel suppliers have lowered surcharges. However, steel prices are unlikely to return to their position prior to their rise since the start of this year and will continue to squeeze suppliers' earnings for much of this year.

Steel Prices Dent Suppliers' Thin Profit Margins

Steel costs have soared for component suppliers since the start of 2004, despite contracts between suppliers and steel producers that lock in steel at a fixed price, as surcharges added on by steel producers have driven up prices. Suppliers were already under pressure from automakers to lower prices on components and the higher costs are further squeezing their profit margins.

Despite ongoing pressure to supply components at lower prices, suppliers have little option but to increase component prices to offset the higher material costs. Component suppliers are also cutting capital spending and reducing other operating costs to offset rising steel costs.

Suppliers such as Hayes Lemmerz Corp., a maker of wheels and transmissions, have warned of the impact of higher steel prices on this year's earnings. It expects that higher steel prices will reduce its earnings by US$10m-US$15m this fiscal year. When Tower Automotive Inc. announced Q1 2004 earnings, it said that steel prices had resulted in US$1m more in costs than expected, and that it expected a greater impact in Q2 and Q3.

For smaller component suppliers the risk of bankruptcy is greater and this could disrupt production at automakers' assembly plants. There is a danger that, as smaller suppliers are forced out of business, the supply chain will break, leaving automakers without the components they need to continue production.

* * *

Suppliers and Automakers File Lawsuits Against Steel-Makers

Both component suppliers and automakers have filed lawsuits against steel producers, accusing them of breaking contracts that lock in steel prices by adding on surcharges.

* * *

As a way of ensuring that suppliers continue to receive the steel they need to produce components, the Detroit Big Three vehicle manufacturers have set up steel resale programmes, buying steel in bulk and selling it on to suppliers at a fixed

price.

Outlook and Implications

The recent rise in the price of steel, fuelled mainly by demand for raw materials from China, could soon start to slow, as the Chinese government has taken measures to slow the pace of China's industrial expansion in the past two months. As a result, steel scrap prices have levelled off and steel suppliers have lowered surcharges. However, steel prices are unlikely to return to the level they were at prior to their rise since the start of this year and will continue to squeeze suppliers' earnings for much of this year.

The pressure is also on for US component suppliers to match prices of components produced in China, where labour is cheaper. The Detroit Big Three automakers have sent a clear message to their component suppliers to match the prices of vehicle components produced in China or they will purchase directly from Chinese component suppliers or from other suppliers willing to match the prices of Chinese-produced components. Further job reductions will occur in the US component-manufacturing industry, as jobs are shifted abroad and the market share of US component suppliers is threatened by the budding Chinese components industry (see United States: 10 June 2004: Detroit 'Big Three' Price Demands Push Component Suppliers Overseas).

113.    On July 27, 2004, the Company issued a press release announcing its financial results for the second of quarter 2004, the period ended June 30, 2004. For the quarter, the Company reported revenues of $783 million and a net loss of $2.7 million, or $0.05 per diluted share. The press release quoted Defendant Ligocki, who stated, in pertinent part, as follows:

*Importantly, our new business launches remain on track.* Although the launch costs are challenging, *we are meeting our timing and quality commitments. Our second-quarter achievements also include completing the company's refinancing, which improves our liquidity* and enables us to focus on continuing to drive operational excellence across the enterprise.

[Emphasis added.] Concerning the Company's future outlook, the Company provided financial guidance for third-quarter 2004, as follows:

The company anticipates 2004 third-quarter revenues to be between $725 million and $735 million, with a loss ranging from $0.18 to $0.22 per diluted share.

Adjusted EBITDA of approximately $45 million to $55 million is expected in the third quarter.

Full-year 2004 revenues are estimated to be approximately $3.15 billion, up from $2.8 billion in 2003, but down by $50 million from the company's previous guidance of $3.2 billion, due to lower production volumes than previously forecast. Excluding restructuring charges, divestiture gains and certain non-recurring, non-cash charges, earnings per share are estimated in the range of $0.00 to $0.08 for the full year 2004. The change in earnings outlook is due to lower production volumes, increased financing costs and higher launch costs. The company anticipates full-year Adjusted EBITDA of between $265 million and $280 million.

The company's estimates for earnings per share and EBITDA exclude restructuring charges and divestiture gains. Cash restructuring charges are expected to be approximately $0.01 to $0.02 per share per quarter for the remainder of 2004, based on previously announced restructuring activities.

114.    The Company also announced on July 27, 2004, that it had completed another round of refinancing, a recurring theme in its battle for survival.  During the conference call held on the same day in connection with the earnings announcement, Mallak summarized the refinancing plan as follows:

The new financing package has 4 basic elements. The first is a $50 million revolver, priced at LIBOR, plus 425 basis points. The second is a 375 million term loan B facility that is fully secured at LIBOR plus 425 basis points. We also entered into a $155 million second lien credit facility, to cover our outstanding letters of credit. This facility will be a synthetic facility and will not appear on our balance sheet, unless the letters of credit are drawn upon. Finally, we were able to issue 125 million of new convertible senior debt, which I previously mentioned. These carry a 5 3/4 coupon and are convertible at a 30% premium.

We used these funds to extinguish our old term credit facility, cover our outstanding letters of credit, and redeem our convertible notes, which were due on August 1, 2004. We were also able to generate 82 million of additional cash to help our liquidity position. And while the additional cash did help our liquidity position, the most important point, that all material debt maturities have been moved out until 2009. Again, this will allow this management team to focus 100% on operational issues and delivering the promised results.

115.    The Company also disclosed that changes in operating income were impacted by, among other factors, the additional expense of steel of $5 million as a result of the escalated prices of steel.  Commenting on the Company's declining ability to offset rising steel prices, defendant Mallak stated:

> And we see -- we see continuing increases coming, especially in Europe and our spot buys in Asia. And we were able to offset that with some of our scrap recovery, which by the way, has been going down now, scrap prices are going down, and so -- our ability to offset the steel is becoming less and less –

116.    During the conference call, Mallak stated the following with regard to the near doubling of interest expenses during the quarter:

> Looking at our results below the operating profit line, you will see that interest expense increased from 18 million in the second quarter 2003, to 38 million during the most recent quarter. Four main factors are influencing this change. First, the issuance of -- in June 2003, of the high yield bond which increased interest cost by $6 million. Second, the write-off of debt issue fees and the call premium associated with redeeming the convertible notes due August 1, 2004, cost $6 million. Third, the higher rates of the new credit facility, impacted the quarter by 2 million. And finally, the fact that we reclassified the trust preferred securities in the third quarter of 2003, under new accounting requirements, which increases interest expense by 4 million, but decreases minority interest by an equal amount.
>
> Going forward, we expect the impact from the higher rates with the new credit facility, to increase our interest costs by approximately $3 million per quarter.

117.    Clearly, events leading up to the "pivotal" second half of 2004, previously trumpeted as the saving grace of the Company, were not progressing as speculated.  Rather, conditions internally and on a macroeconomic level were continuing to worsen for the Company.  Yet, despite the obvious problems that had surfaced, thereby casting further doubt on the Company's future and confirming that the Company's stock was a high-risk investment  not appropriate for the Plans or Class members, a condition that was present throughout the Class

Period, the defendants continued to permit the Plans and the Class to acquire and retain shares in the Company's common stock.

118.   Defendants' actual uncertainty over the direction and momentum of the Company is  reinforced by defendant Ligocki's apparent about-face with regard to the timing of events indicating the Company's purported turn-around.  During the July 27, 2004, conference call, defendant Ligocki, amidst what were her usual positive statements alluding to the Company's prospects, stated that "The 2 most challenging quarters were always going to be the second and the third in 2004, and now one of those is behind us."

119.   Yet, this had never been the position of the Company.  To the contrary, the rosiest of pictures were painted for the latter half of 2004:

(a)   During the conference call held on October 23, 2003, in connection with the financial results for the third quarter 2003, defendant Ligocki commented on the timeline for when the Company anticipated a reduction in capital expenditures and costs associated with the new product launches, stating, "[w]e have to go through the launch phase for the first part of the year and the last part of '04 is when we really anticipate positive cash flows leading into 2005."

(b)   During the conference call held on February 12, 2004, in connection with the financial results for the first quarter of 2004, defendant Millak stated "[a]s we have stated before, during 2004, we will use cash during the first half of the year, and generate it during the second half of the year. This is due to the launches, which are occurring during the first half" and "we are going

to use cash during the first half so it will get tighter [leverage ratio compliance]

before we get through to the improvement we see in the second half."

Mallak also reiterated that launch costs would lighten up in the third and fourth quarter of

2004.  Defendant Ligocki also stated:

> And then the launches start coming onboard and most of the production
> begins June, July and August, the summer with our automaker customers and then
> it ramps through the rest of the year. I mean that's the single biggest swing in the
> operating free cash flow. And then of course the launch costs fall out from the
> first half to the second half.

120.    Ligocki's July 27, 2004, pronouncement that the third quarter of 2004 was also

going to be a "challenge"  was particularly distressing in light of the Company's continuous

struggle to reduce its crushing debt and achieve adequate liquidity.  These pressing needs could

not withstand another deferment of positive cash flow for yet another quarter.  Throughout 2003,

defendants and Company reiterated that much of the cash outflow would occur in the first half of

2004, as a result of new product launches, resulting in the latter half of 2004 to be a period of

substantial turn around for liquidity and cash flow as the purported investments in the first half

of 2004 would payout.  (In fact, this did not happen.)

121.    Ligocki's sudden about-face on the timing of the Company's turn-around evinces

the true facts – defendants were aware of the substantial financial difficulties of the Company;

defendants were aware of the substantial risks to shareholders, including Plan participants, of the

Company given the severe liquidity crises and debt burden; and defendants were aware that any

purported plan to turn around the Company was more than just a gamble, it was a near

impossibility.  Yet, despite this knowledge, defendants allowed the Plans and Class Members to

acquire and retain shares of the Company.  Moreover, as events continued to unfold, including

the additional refinancing that costs the Company substantial sums and escalating steel prices, most of which weighed against the successful implementation of the turnaround "plan," defendants continued to allow the Plan and Class Members to acquire and retain shares of the Company. In essence, defendants high-risk "plan" was not going as intended.

122.    Yet, consistent with their actions throughout the Class Period, they did nothing to protect the Plans or the Class.

123.    On September 14, 2004, WMRC reported that the Company would incur cost of $2.4 million as a result from a cut in production at one of its plants in Michigan.

124.    On October 5, 2004, the Company revised its expectations for its financial results for the third quarter of 2004, announcing that it would lose twice as much as it projected when it gave its already disappointing financial guidance it provided on July 27, 2004. The Company blamed continued increases in steel costs, higher launch costs and lower vehicle production volumes. The press release issued by the Company stated:

> Tower Automotive, Inc. today announced that it expects earnings to be down as a result of lower vehicle production volumes in North America, continued escalation of steel costs and, to a lesser extent, higher launch costs on new business. Tower expects to report a third-quarter 2004 net loss of between $22.5 million and $25 million, or $0.39 to $0.43 per diluted share. This compares to previous guidance for the third-quarter 2004 of a net loss of between $10.4 million and $12.8 million, or $0.18 to $0.22 per diluted share. These net loss and diluted loss per share estimates exclude restructuring charges and certain non-recurring, non-cash charges. Revenues have softened for the quarter to a range of $710 million to $720 million versus previous guidance of between $725 million and $735 million. Liquidity as of September 30, 2004, is expected to be in excess of $115 million.
>
> "The combination of lower production volumes on our key platforms in North America, along with continued steel cost increases, added further challenges to the third quarter," stated Kathleen Ligocki, president and chief executive officer of Tower Automotive. "Additionally, even though our launch costs on one major launch are running slightly above plan, it is important to point

out that we have met all of our timing and quality commitments to our customers."

125.    On October 6, 2004, *Reuters* published an article titled "US Auto Parts Makers

Steel Price Hit Likely in '05" that stated:

> High steel prices that have crushed U.S. auto parts suppliers' results for the second half of the year show no signs of abating into 2005, analysts said.
>
> And rising costs for other metals, resins and raw materials which largely have been pushed aside in the talk about steel prices also may pressure 2005 results, they said.
>
> "For the auto parts sector as a whole, we continue to believe 2005 consensus earnings expectations are at risk by up to 10 percent to 30 percent because of higher steel costs," J.P. Morgan analyst Himanshu Patel said Wednesday in a note.
>
> * * *
>
> The pressure from steel and resin costs appears largely indiscriminate across the sector for 2005, but may hit some large suppliers harder than others, Patel said.
>
> "Steel, plastics, aluminum and lead costs are definitely a negative for probably everyone, though for some it won't show up as much (in results)," Standard & Poor's credit analyst Martin King said, adding that companies have almost no ability to increase prices to offset higher materials costs.
>
> Many parts suppliers will lock in contracts with steel producers for 2005 in the next few weeks or months, and those costs will probably exceed 2004 levels, King said.
>
> * * *
>
> While steel has played a factor in compressing results for the largest suppliers, it also has been blamed for putting two parts-casting companies into bankruptcy and pushing other small suppliers close to seeking court protection.

126.    On October 20, 2004, Tower Automotive filed a report with the SEC on Form 8-

K stating that it was seeking amendments to its credit facility to increase its ability to securitize

its accounts receivable.  This action was necessary to replace liquidity that had been provided to

the Company through its participation in early payment programs, off-balance sheet

arrangements with its customers that allowed its customers to make early payments to the

Company at a discount.  These arrangements were being cancelled by the Company's customers,

including Ford, General Motors and Daimler Chrysler.  An article published the same day by

*Dow Jones*, titled "Tower Automotive Seeks Amendment to Credit Facility" stated:

> Tower Automotive Inc. (TWR) disclosed on Wednesday that it is seeking to increase the securitization of its accounts receivable.
>
> The company said it is making the move because automakers have decided to cancel off-balance sheet arrangements that aided the liquidity of suppliers such as Tower Automotive. The off-balance sheet arrangements were designed to provide discounts for early payments by automakers, Tower Automotive said in a filing with the Securities and Exchange Commission.
>
> Tower Automotive said that its senior secured credit facility permits the securitization of up to $50 million of accounts receivable, but the company is seeking an amendment to the credit agreement to increase that limit.
>
> In its request for the amendment, Tower Automotive said that automakers developed the off-balance sheet payment plans in 2001 to help suppliers deal with the liquidity impact of an industry downturn and terrorism-related volatility in financial markets.
>
> The balance sheet impact of the arrangements was to reduce Tower Automotives' accounts receivable, Tower Automotive said, with the discount to automakers being treated as an interest expense.
>
> Ford Motor Co. (F) is phasing out the arrangements in two steps, the first in September and the next in December. DaimlerChrysler (DCX) plans to phase out the arrangements in January 2005, Tower Automotive said, and General Motors Corp. (GM) is expected to phase out such arrangements in December 2005.
>
> Tower Automotive said that the approximate liquidity impact, by customer, will be: Ford, $80 million; General Motors, $25 million; and DaimlerChrysler, $35 million.

127.    Also on October 20, 2004, the Company announced financial results for its third

quarter of 2004.  The Company once again lowered its estimates for its future financial results,

projecting losses for the fourth quarter and the full year wider than analysts' consensus

estimates.  It ended the quarter with net debt of $1.3 billion.  Commenting on the difficulties

experienced during the quarter, defendant Ligocki stated the following during the conference call

held the same day:

> This was certainly a challenging time, both for Tower and for the
> automotive industry. Macroeconomic forces, in the form of lower vehicle
> volumes, primarily on key platforms in North America, and increased steel costs,
> both in base prices and surcharges, combined with Tower's specific incremental
> launch expenses for our Chicago program to pressure earnings sufficiently for us
> to issue the earnings warning earlier this month.

128.    Defendant Ligocki also commented on the higher costs it was experiencing

associated with one of its major product launches:

> On one of the last two major launches, our team in Chicago is meeting all
> key program milestones, and exceeding quality expectations. But we have
> continued to incur costs higher than planned, to assure this throughput and quality
> level during this early launch phase. These costs should decline in the next quarter
> and reach normal operating levels early next year.

129.    Again advancing a revisionist outlook on what the Company shared with the

public, the Plans, and members of the Class, defendant Ligocki stated, "[w]e knew that this year

would be tight, even without lower vehicle volumes and steel" and  that the third quarter was

"always thought to be a tough one."  As set forth in ¶119, the Company's statements concerning

2004 consisted of a rosy outlook for a strong turn-around beginning in the second half of 2004.

If, in fact, defendant Ligocki knew that all of 2004 would be "tight," then it evidences an

admission that defendants failed to fulfill their fiduciary obligation to provide complete and

accurate information material to the Plan participants and beneficiaries so that Plan participants

could make informed investment decisions concerning their Plan investments in Tower

Automotive.

130.     During the conference call, the Company reported that its results had been

impacted by, among other factors, the high price of steel which resulted in an additional $12

million expense. Given the significant impact that the price of steel was having on the

Company's financial performance, defendant Ligocki provided the following breakdown of the

impact of steel on the Company:

> The next slides address our current status on steel. We showed the pie chart on the left side in earlier presentations. This breaks out the $1b steel buy for 2004 into 60% resale, composed of 40% in North America and 20% in Asia, and 40% direct buy, composed of 30% in Europe and Brazil, and 10% bought directly here in North America. The steel increases in 2004 were incurred on the direct buys, primarily in North America.

> In 2005, our plan shows our steel buy increasing to about $1.2b, with over 67% on resale, up significantly from this year. 25% would be direct buys with long-term contracts, which we plan to link directly to customer agreements for recovery. 8% would still be in exposed direct buy, mostly here again in North America. And we are working hard to reduce this exposure.

> A quick reflection on steel in 2004. Increases in surcharges once thought to be primarily a first half phenomenon continued through the balance of the year. The market saw year over year price increases of 120% on U.S. hot rolled coil, over 50% on European hot rolled, and over 45% on Korean hot rolled coil. The announcement this week of a major London steel company purchasing U.S.-based International Steel Group or ISG will drive further changes into this market.

> Our resale programs did provide protection for the significant portion of our buy, although our OEM resale customers certainly felt the brunt of the price increases. Actually, one automaker recently asked for our support in advocating the elimination of trade barriers in the United States, likely to mask U.S. legislation discussion intended to increase market competition.

> We have had some success recovering surcharges in Europe, Brazil and Asia. But the United States, as I said earlier, has proven much more difficult, as all parties took tough positions for most of the year. Tower did end up absorbing most of the increases on the U.S. direct buys, only partially offset by scrap price

increases, since contracts had been negotiated over a year ago, when the outlook was so different, and no one knew how long the situation would last.

Operations have been further disrupted by shortages in some types of steel. And at a few times, we even had to trade steel between plants to keep running, or buy very expensive steel coils. We're working on several strategies to assure that 2005 is better.

131. During the conference call, defendant commented on the actual results versus the initial expectations, as follows:

In analyzing what changed during the quarter from that guidance at the beginning of the quarter, you can see that almost 70% of the change was due to volume reductions during the quarter, specifically in North America, steel cost increases, and continued higher than expected launch costs at Chicago.

As Kathleen mentioned, we also experienced some production cost issues at our Gent facility that were higher than we had anticipated. Additionally, we did take some small non-cash asset write-offs, due to various fiscal asset inventories around the globe.

132. On November 22, 2004, *Moody's* issued a report indicating that it was placing Tower Automotive's debt ratings on review for possible downgrade. The report stated, in relevant part:

Moody's placed Tower's debt ratings on review for possible downgrade due to the company's increasingly constrained liquidity, insufficient cash interest coverage by operating earnings, and rising leverage. Tower's free cash flow generation has been constrained by significant up-front launch costs and capital expenditures associated with new business rollouts, restructuring and consolidation charges, rising raw materials prices, lower North American OEM production levels, and other factors. Moody's review will center upon the likelihood of whether Tower will be successful in resolving its growing liquidity problem, as well as upon management's updated estimates regarding the timing of the company's return to sustainable free cash flow generation and the support provided for these assumptions. This will include updates regarding the performance of Tower's extensive number of recent launches, estimated production levels associated with major platforms, expected new business awards, projections regarding steel and other commodity prices, anticipated savings from restructuring actions as well as increased centralization and standardization, and other factors. Moody's plans to meet with senior management during December

2004.

For the last twelve months ended September 30, 2004, Tower's total debt/EBITDAR leverage (including off-balance sheet obligations as debt) rose to approximately 6.4x. EBIT coverage of cash interest was insufficient at about 0.6x, and the company appears unlikely to realize earlier projections of 1.0x cash interest coverage through year end. During the LTM period free cash flow was negative $142 million and capital expenditures equaled about $227 million, or 1.6x depreciation.

The affirmation of Tower's SGL-4 speculative grade liquidity rating reflects that the company's liquidity remains weak. Tower's consolidated cash balance as of September 30, 2004 approximated $145 million, and the company remained fully drawn under its senior secured credit facilities. Given the volatility of Tower's intraperiod cash flows and the company's $3 billion annual revenue base, this level of cash availability appears to be low. In addition, Tower acknowledges that it has been stretching trade payables by an average of up to 15 days, which has temporarily generated about $80 million of additional cash from operations.

133.    On December 3, 2004, the Company announced that it was deferring payment of

the dividend payment on certain convertible preferred securities issued by the Tower Automotive

Capital Trust.  The company cited "short-term" liquidity issues arising from the termination of

the early payment programs of its customers.

134.    On January 20, 2005, the Company issued a press release titled "Tower

Automotive Announces Update on Liquidity" that stated as follows:

Tower Automotive, Inc. today announced that its ongoing initiatives to improve liquidity were adversely impacted by the length of customer shutdowns over the holiday season. While the holiday shutdowns were planned, the length of these shutdowns were longer than anticipated at certain key customers. Cumulatively, these shutdowns will adversely impact liquidity by approximately $40 million during the first quarter of 2005.

As previously announced, Tower Automotive has taken a number of initiatives to improve its liquidity position. Specifically, as previously announced on December 3, 2004, Tower Automotive deferred the dividend payment of approximately $4.4 million on the 6-3/4% trust convertible preferred securities issues by the Tower Automotive Capital Trust that would otherwise have been

paid on December 31, 2004. Also, as previously announced on January 4, 2005, Tower Automotive obtained a $50 million accounts receivable securitization facility through GE Commercial Finance. That facility yielded net proceeds of approximately $44 million.

These and other initiatives were taken to address the elimination of early payment programs from the company's customers. For January, those changes in payment terms will adversely impact liquidity by approximately $17 million.

Despite Tower Automotive's efforts and the continuing cooperation of its loyal customers and dedicated suppliers, the company continues to face significant challenges in meeting its ongoing liquidity requirements. Tower Automotive is continuing to work with its customers and suppliers to address its liquidity issues. In addition, Tower Automotive is continuing to pursue a European factoring facility, the possible sale of certain equipment and other liquidity initiatives.

135.    Following this news, on January 21, 2005, *Standard & Poor's* ("S&P"), a credit ratings agency, cut Tower Automotive's credit rating by three notches, slashing it further into "junk" rating levels, to a "CCC."  In its report, *S&P* stated that if customer production schedules did not firm in the near term, that it increased the chances of the Company defaulting.  *Moody's* followed suit on January 24, 2005, cutting Tower Automotive's credit ratings deeper into "junk" territory.  In its report, *Moody's* noted the "rising potential for bankruptcy or some other form of distressed balance sheet restructuring to be required."

136.    On February 2, 2005, Tower Automotive announced that it had filed to reorganize under Chapter 11 of the U.S. Bankruptcy Code in order to address liquidity needs and facilitate debt restructuring.  In the Company's press release, defendant Ligocki stated:

Over the past twelve months, we have been focused on launching our significant new business backlog while taking the actions necessary to improve profitability and restore long-term financial strength to Tower so that we can continue to grow and meet our customers' needs. Like many companies in the automotive sector, Tower has been affected by lower production volumes on key auto maker platforms and increased steel prices. Additionally, the recent termination of early pay programs at certain auto makers has adversely affected

our liquidity. These factors, combined with a complex and restrictive capital
structure and an unsustainable debt load have made it clear that a financial
reorganization was necessary to resolve these issues. By reducing our debt to
more manageable levels and simplifying our capital structure, we will be better
able to respond to changes in the market place, satisfy the needs of our customers
and help ensure our long-term viability.

137.    If the bankruptcy proceedings conclude in a similar fashion as those of most other

publicly held companies, the value of the Plans' holdings in Tower Automotive common stock

will be zero.  At the beginning of the Class Period, when the defendants knew or should have

known that the Company's common stock was not an appropriate investment alternative for the

Plans and the Class, the price of Tower Automotive's common stock closed for trading, August

3, 2001, at $14.15 per share.

138.    A succinct summary of the severe financial and operating problems that plagued

the Company throughout the Class Period was set forth in an article published on February 7,

2005, by *Automotive News*, entitled "Tower's Problems Began Before Ligocki" that stated:

> When Tower Automotive Inc. CEO Kathleen Ligocki said last month that
> the supplier had obtained a $50 million loan, the response from investors was
> underwhelming.

> That $50 million, says one analyst, was the equivalent of "bringing Band-
> Aids to the scene of a train wreck. It's just not enough."

> Neither were the changes Ligocki brought to Tower since joining the
> company from Ford Motor Co. 18 months ago. In the end, a Chapter 11
> bankruptcy court filing on Wednesday, Feb. 2, offered her a way to unload debt
> and boost cash flow.

> Impossible burden

> As the company's problems intensified, its debt load became an impossible
> burden. The Chapter 11 filing came one day after the company faced a payment
> on a $10 million loan with a 9.25 percent interest rate.

> Ligocki told creditors in a letter that Chapter 11 offered the best

64

opportunity to "implement the changes necessary to remain competitive." Ligocki was not available for comment.

Creditors and investors in the world's largest supplier of vehicle frames could be in for a rough ride. Analyst David Leiker of Robert W. Baird & Co. of Milwaukee says Tower is likely to emerge from bankruptcy court as a public company owned primarily by debt holders.

Many shareholders are unlikely to receive anything, Leiker says. Tower's share price dropped from $1.10 on Jan. 27 to 77 cents after the filing.

The filing by the Novi, Mich., company does not include operations in Europe, Asia, Brazil and Canada.

The damage to Tower was done before Ligocki joined the company.

During the 1990s, Tower bought too many companies, paid too much for them and failed to integrate them. Troubled launches also hurt, says a source familiar with the company.

Ligocki cut waste, sold underperforming plants and worked to reduce Tower's dependence on the Big 3. In 2003, 64 percent of Tower's global sales went to the Big 3, down from 68 percent in 2002.

But Ligocki struggled with one of the most leveraged balance sheets in the industry. Even if Tower used its cash flow exclusively to pay down debt, it would take six years. Long-term debt was 73 percent of capital for 2003.

Multiple problems

Tower won business, but the cost of launching those programs eroded its cash flow margins to just half of the 14.1 percent it enjoyed in 2000, according to analyst Shelly Lombard of Gimme Credit Publications Inc.

Pressures from lower production volume, Big 3 pricing policies and high steel prices added to the problems.

Ligocki kept Tower afloat a month after analysts said the $50 million cash infusion from GE Commercial Credit was not enough to cover cash needs. But for Ligocki, time simply ran out.

139.    An article published February 5, 2005, by *Detroit Free Press* titled "Tower Automotive Has High Hopes Entering Bankruptcy" also noted the extensive risk that the

Company was positioned throughout the Class Period, noting "[i]n the case of Tower, the debt built up from all the acquisitions [throughout the 1990s] made it vulnerable to downturns or unforeseen events, such as the price of steel doubling from 2003 to 2004."

140.    By no later than the beginning of the Class Period, Tower Automotive and the Individual Defendants knew, or should have known, that Tower Automotive's common stock was a highly inappropriate investment for a long-term retirement savings plan such as the Plan because of the Company's financial condition, operational performance and macroeconomic events occurring throughout the Class period. Despite this knowledge, defendants continued to offer Tower Automotive's stock as a Plan investment alternative and failed to impute their full knowledge of the Company's operations on Plan Participants so that the Plan Participants could make an informed decision concerning their Plan investments in Company stock.

## CLAIMS FOR RELIEF

141.    ERISA § 404(a)(l)(A) (29 U.S.C. § 1104(a)(l)(A)) imposes on a plan fiduciary a

duty of loyalty - that is, a duty to "discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries and ... for the exclusive purpose of... providing benefits to

participants and its beneficiaries." Section 404(a)(l)(B) (29 U.S.C. § 1104(a)(l)(B)) also imposes

on a plan fiduciary a duty of prudence - that is, a duty to "discharge his duties with respect to a

plan solely in the interest of the participants and beneficiaries and . . . with the care, skill,

prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a

like capacity and familiar with such matters would use in the conduct of an enterprise of a like

character and with like aims."

142.    A plan fiduciary's duties of loyalty and prudence includes a duty to disclose and

inform. This duty entails: (1) a negative duty not to misinform; (2) an affirmative duty to inform

when the fiduciary knows or should know that silence might be harmful; and (3) a duty to

convey complete and accurate information material to the circumstances of participants and

beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this

case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the

participants and beneficiaries, on the other. In a plan with various funds available for investment,

this duty to inform and disclose also includes: (1) the duty to impart to plan participants material

information of which the fiduciary has or should have knowledge that is sufficient to apprise the

average plan participant of the risks associated with investing in any particular fund; and (2) the

duty not to make material misrepresentations.

143.    By no later than the commencement of the Class Period, defendants breached

their fiduciary duties to disclose and inform with respect to the Plans' use of employer stock as a

plan investment. During the Class Period, and before, any investment in employer stock in the Plan was an undiversified investment in a single company's stock. As a result, any such investment carried with it an inherently high degree of risk. These inherent risks made defendants' duty to provide complete and accurate information about investing in company stock even more important than would otherwise be the case. Rather than providing complete and accurate information to the Plans' participants and beneficiaries regarding the risks of investing in company stock in the Plan, defendants did the opposite: they withheld and concealed material information during the Class Period and before, and instead actively misled the participants and beneficiaries of the Plan about the appropriateness of investing in company stock and about defendants' earnings prospects and business condition, thereby encouraging participants and beneficiaries of the Plan to continue to make and to maintain substantial investments in company stock in the Plan.

144.    A fiduciary's duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of all the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan. Defendants breached this duty of investigation and monitoring with respect to company stock. By no later than the beginning of the Class Period, defendants could not have reasonably made a determination that company stock was a suitable investment for the Plan, either for a participant's discretionary account or for the match. In fact, by the beginning of the Class Period, if not before, company stock was plainly an unsuitable investment option for the Plan.

145.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

146.    Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow company stock as a Plan investment during the Class Period, by failing to engage independent fiduciaries who could make independent judgments concerning the Plans' investment in company stock and the information provided to participants and beneficiaries concerning it, and, generally, by failing to take whatever steps were necessary to ensure that the fiduciary of the Plan did not suffer from a conflict of interest.

147.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents.  While the basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary, including a plan sponsor-fiduciary, may not blindly follow the plan document if to do so leads to an imprudent result. ERISA § 404(a)(l)(d) (29 U.S.C.§1104(a)(l)(D)).

148.    To the extent that defendants followed the direction of the Plan documents, for example, in continuing to place the match in company stock during the Class Period, beginning no later than the matches of November 1, 1998, they further breached their fiduciary duties.

## **CAUSATION**

149.    The Plan suffered a loss, and Plaintiff and the other Class members were damaged, because substantial assets in the Plan were invested in company stock during the Class Period in violation of defendants' fiduciary duties.

150.    As fiduciaries, defendants were responsible for the prudence of investments in the Plan during the Class Period unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in its individual accounts pursuant to ERISA §404(c) and the regulations promulgated under it.  Those provisions were not complied with here; instead of taking the necessary steps to ensure effective participant control by complete and accurate disclosure and regulatory compliance, defendants did exactly the opposite.  As a consequence, participants in the Plan did not control the Plan assets that were invested in company stock, and defendants remained entirely responsible for ensuring that such investments were and remained prudent. Defendants' liability to the Plan for damages stemming from imprudent Plan investments in company stock is therefore established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan during the Class Period, without regard to whether or not the participants relied upon defendants' statements, acts, or omissions.

151.    The Plan also suffered a loss, and Plaintiff and the other Class members were damaged, by defendants' above-described conduct during the Class Period and before, because defendants' materially deceptive statements, acts, and omissions were fundamentally designed to deceive Plaintiff and the other Class members about the prudence of making and maintaining investments in company stock. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in

harm to the participant, the participant is presumed as a mater of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, defendants' above-described statements, acts, and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in company stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of its plan assets in company stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on defendants' deceptive statements, acts, and omissions.

152.    Plaintiff further contends that the Plan suffered losses, and Plaintiff and the other Class members were damaged, by defendants' above-described conduct during the Class Period and before, because that conduct fundamentally deceived Plaintiff and the other Class members about the prudence of making and maintaining investments in company stock, and that, in making and maintaining investments in company stock, Plaintiff and the other Class members relied to their detriment upon defendants' materially deceptive statements, acts, and omissions.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

153.    ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary ... who breaches any of the... duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate...."

154.    With respect to the calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and

beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plans' assets to what they would have been if the plan had been properly administered.

155.    Plaintiff and the Class are therefore entitled to relief from defendants as follows:

(a)    a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a), 29 U.S.C. § 1109(a);

(b)    injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)&(3), 29 .S.C. §§ 1109(a) and 1132(a)(2)&(3);

(c)    reasonable attorney fees and expenses as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law;

(d)    taxable costs; and

(e)    interest on some or all of these amounts as provided by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    determining that this is a proper class action to be certified under Rule 23 of the Federal Rules of Civil Procedure;

(b)    declaring that defendants have violated the duties, responsibilities and obligations

imposed upon them as fiduciaries and co-fiduciaries under ERISA;

(c)    awarding extraordinary, equitable and/or injunctive relief as permitted by law;

(d)    awarding Plaintiff, Class members and the Plan's restitution and/or remedial

relief;

(e)    awarding Plaintiff, Class members and the Plan's pre-judgment and post-

judgment interest, as well as their reasonable attorneys' fees, expert witness fees and other costs;

and

(f)    awarding such other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a trial by jury.

DATED: April 7, 2005

**GLANCY BINKOW & GOLDBERG LLP**

By:_____/s/_____
        Robin B. Howald (RH 9974)
1501 Broadway, Suite 1900
New York, New York 10036
Telephone:    (917) 510-0009

**GLANCY BINKOW & GOLDBERG LLP**
Lionel Z. Glancy
Michael Goldberg
1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**Attorneys for Plaintiff**